STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Brian K. AVERY, Defendant-Appellant.†

Supreme Court

*No. 2010AP1952. Oral argument October 5, 2012.
—Decided January 30, 2013.*

2013 WI 13

(Also reported in 826 N.W.2d 60.)

† Motion for Reconsideration denied March 27, 2013.

For the plaintiff-respondent-petitioner, the cause was argued by *Thomas J. Balistreri,* assistant attorney general, with whom on the briefs was *J.B. Van Hollen,* attorney general.

For the defendant-appellant, the brief was filed by *Keith A. Findley* and *Tricia J. Bushnell,* and the *Wisconsin Innocence Project, University of Wisconsin Law School,* Madison, and oral argument by *Keith A. Findley.*

An amicus curiae brief was filed by *Robert R. Henak* and *Henak Law Office, S.C.,* Milwaukee, on behalf of the Wisconsin Association of Criminal Defense Lawyers.

An amicus curiae brief was filed by *James Friedman* and *Godfrey & Kahn, S.C.,* Madison, *Lori R. Mason* and *Cooley, LLP,* Palo Alto, *Kyle C. Wong* and *Maco Stewart,* and *Cooley, LLP,* San Francisco, on behalf of the Innocence Network.

An amici curiae brief was filed by *Michael B. Van Sicklen* and *Foley & Lardner, LLP,* Madison, on behalf of the following:

411

Professor D. Michael Risinger, the John J. Gibbons Professor of Law at Seton Hall University School of Law; Thomas L. Bohan, Ph.D., J.D., a Former President of the American Academy of Forensic Sciences; Simon Cole, Member of the American Judicature Society's Commission on Forensic Science and Public Policy; Dr. Itiel E. Dror, Institute of Cognitive Neuroscience at University College, London, and is also the principal consultant and researcher at Cognitive Consultants, International; Professor Gary Edmond, Director of the Program in Expertise, Evidence and Law and an Australian Research Council Research Fellow in the School of Law at The University of New South Wales, Sydney, Australia; Dr. Allan Jamieson, Director of The Forensic Institute in Glasgow, Visiting Professor of Forensic Sciences at Staffordshire University, and a Fellow of the British Society of Biology (formerly the British Institute of Biology); Dr. Roger Koppl, Director of the Institute for Forensic Science Administration of Fairleigh Dickinson University, where he is also a Professor of Economics and Finance; Irving L. Kornfield, Ph.D., Professor of Biology and Molecular Forensics, University of Maine; Dr. Dan Krane, Professor of Molecular Biology at Wright State University; Professor Jennifer L. Mnookin, Professor of Law at the UCLA School of Law; Professor Christopher T. Robertson, Associate Professor of Law at the University of Arizona Rogers College of Law; Dr. Michael J. Saks, the Regents' Professor of Law and Psychology and Faculty Fellow, Center for Law, Science & Innovation at Arizona State University; Dr. William C. Thompson, Professor at the University of California at Irvine (UCI), holding joint appointments in the School of Law and Department of Psychology and Social Behavior.

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This is a review of a published decision of the court of appeals,[1] which reversed the decision of the Milwaukee County Circuit Court, Judge Dennis Cimpl presiding, denying Brian Avery's (Avery) motion for a new trial.

¶ 2. In 1995, a jury convicted Avery of two counts of robbery, party to a crime. Twelve years later, in 2007, Avery brought a motion for postconviction relief. Avery argued that he should be entitled to a new trial under the theories of newly discovered evidence and in the interest of justice. Both arguments were based on new expert analysis of a video of one of the robberies. By applying new technology, digital photogrammetry,[2] one expert concluded that Avery was too tall to be the robber in the video. After an evidentiary hearing, the circuit court denied Avery's motion for a new trial. The court of appeals reversed. We now reverse the court of appeals and conclude that Avery is not entitled to a new trial under either theory.

¶ 3. We conclude that there is not a reasonable probability that a jury, looking at both the evidence presented at trial and the new digital photogrammetry evidence, would have a reasonable doubt as to Avery's guilt. We also conclude that the court of appeals erroneously exercised its discretion when it failed to properly analyze whether this was an exceptional case that entitled Avery to a new trial in the interest of justice. Avery is not entitled to a new trial in the interest of justice because the controversy was fully tried even though the jury did not hear the photogrammetry evidence.

[1] *State v. Avery*, 2011 WI App 148, 337 Wis. 2d 560, 807 N.W.2d 638.

[2] Photogrammetry is the "process of making precise measurements by means of photography." *The American Heritage Dictionary of the English Language* 1364 (3d ed. 1992).

413

## I. FACTUAL BACKGROUND
## AND PROCEDURAL POSTURE

¶ 4. In July 1994, Avery was charged with two counts of armed robbery, party to a crime, in violation of Wis. Stat. §§ 943.32(1)(b), (2)[3] and 939.05 (1993–94).[4] The first count related to a robbery that occurred at Malone's Fine Foods (Malone's) on the evening of July 7, 1994. The second count related to a robbery that occurred at Attari Food Market (Attari) the afternoon of July 8, 1994.

¶ 5. During the four-day jury trial in April 1995, the State introduced two witnesses who had identified Avery as the perpetrator, Avery's confession, Avery's written apology, and a telephone conversation Avery had with his mother wherein he apologized for getting in-

---

[3] Wisconsin Stat. § 943.32, "Robbery," states in part:

(1) Whoever, with intent to steal, takes property from the person or presence of the owner by [] the following means is guilty of a Class C felony:

. . . .

(b) By threatening the imminent use of force against the person of the owner or of another who is present with intent thereby to compel the owner to acquiesce in the taking or carrying away of the property.

(2) Whoever violates sub. (1) by use or threat of use of a dangerous weapon or any article used or fashioned in a manner to lead the victim reasonably to believe that it is a dangerous weapon is guilty of a Class B felony.

[4] Wisconsin Stat. § 939.05, "Parties to crime" states in part:

(1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although the person did not directly commit it and although the person who directly committed it has not been convicted or has been convicted of some other degree of the crime or of some other crime based on the same act.

volved. The first identification witness was Alcherie Simmons (Simmons), a witness to the Malone's robbery. During the trial, she recanted and told the jury that she had never identified Avery to the police. However, Detectives James Kraft and Ralph Spano testified that they each interviewed Simmons shortly after the robbery, and that during those interviews, Simmons had identified Avery as the robber from a set of photographs. They also testified that she recognized Avery from a local Boys and Girls Club and Sherman Park. Detective William Blumenberg (Blumenberg) testified that Simmons told him she feared the robbers would retaliate against her if she spoke to the police. Officer Eduardo Negron testified that Simmons told him if she was put on the stand, she would "look stupid" and would say she did not know anything. The second identification witness was Mueen Hamdan (Hamdan), who witnessed the Attari robbery. Hamdan identified Avery from a set of photographs about three weeks after the robbery. He also identified Avery in the courtroom as one of the robbers.

¶ 6. Blumenberg also testified that Avery had confessed to participating in both robberies. Avery was 19 years old at the time of his arrest and was a high school graduate. Blumenberg testified that he had interrogated Avery on the afternoon of July 10, 1994, and that Avery told him the robbers met up at Sherman Park before both robberies, drove over to the stores, committed the robberies, and drove back to Sherman Park. Blumenberg relayed that Avery confessed to being the person with the sawed-off shotgun in the video of the Malone's robbery and that Avery identified the rest of the robbers by their names or nicknames.[5]

---

[5] In Avery's confession, he identified one of the robbers as "Dope Fiend." Blumenberg showed Avery a picture of DeShawn

Blumenberg testified that Avery had signed the interrogation form detailing the robberies and that Avery personally wrote an apology on the form. Finally, Blumenberg testified that after the interrogation, he overheard Avery call his mother and apologize to her that he had "gotten involved."

¶ 7. The jury was shown the video of the Malone's robbery during the trial to provide context for witness testimony. In closing arguments, however, the prosecutor asked the jury not to rely on the video for identification because it was of such poor quality.

¶ 8. Throughout the trial, Avery maintained his innocence. Three alibi witnesses testified that Avery was watching basketball at North Division High School shortly before the Malone's robbery.[6] Two witnesses testified to seeing Avery as they left the gym at approximately 8:15 p.m.; one witness testified to seeing Avery

Rodgers, and Avery identified Rodgers as "Dope Fiend" and stated that Rodgers was a participant in the robberies. Rodgers, who was also arrested and prosecuted for his participation in the robberies, implicated Avery when he told the police that he committed the robberies with "Brian" who he knew from Sherman Park and the Boys and Girls Club.

[6] A map in the State's brief shows that North Division High School, located at 1011 W. Center Street in Milwaukee, Wisconsin, is approximately 13 blocks away from the Malone's Fine Foods, located at 3610 N. Teutonia Avenue. Detective Spano testified that in a car, it took him two minutes and 40 seconds to drive from North Division High School to Malone's. The exact time of the Malone's robbery is not clear. There is no time stamp on the video. One officer testified that, based on his investigation, he believed the Malone's robbery occurred at approximately 8:30 p.m. The complaint also states that the robbery occurred at approximately 8:30 p.m., which was based on the statement of a witness, Ahmed Hasan. The State argues that Avery's testimony that he was at North Division High School shortly before the Malone's robbery is actually inculpatory, not exculpatory.

as the witness left the gym at approximately 8:05 p.m. Two of Avery's family members testified that Avery was at home when the Attari robbery occurred.

¶ 9. Avery testified that on July 7, the date of the Malone's robbery, he and his friends watched basketball at North Division High School from about 7 p.m. until approximately 8:30 p.m. He testified that after the games, he went to two friends' houses and got home about 11 p.m. He also testified that on July 8, the date of the Attari robbery, he was at home and talking on the telephone with a high school friend. That testimony was corroborated by the friend and by phone company records. Finally, Avery testified that his confession was coerced. He testified that he maintained his innocence throughout the first interview in the early morning hours of July 10; that he did not sleep between the end of the first interview at approximately 5:30 a.m. and the beginning of the second interview, at approximately 12 p.m.; and that the detectives told him he could go home only if he cooperated. He testified that when he confessed, he was simply agreeing to the information that the detectives relayed to him, and that he wrote the apology because the detectives told him the prosecutor would not come down as hard on him.[7] He testified that he was not involved in the robberies.

¶ 10. On April 7, 1995, the jury found Avery guilty of both robberies.

¶ 11. On June 17, 1996, Avery filed a motion for postconviction relief under Wis. Stat. § 809.30 (1993–94). The motion was partially granted and partially denied by the circuit court on October 1, 1996, granting an evidentiary hearing. On December 4, 1996, the circuit court

---

[7] On appeal, Avery does not argue that his confession was involuntary. There is no dispute that Avery waived his *Miranda* rights before both interrogations began.

held a *Machner*[8] hearing to determine if Avery's trial counsel was ineffective. On January 9, 1997, the circuit court issued a decision and order denying all of Avery's postconviction motions. Avery appealed his conviction and trial court orders denying his motions for postconviction relief. On December 1, 1998, the court of appeals affirmed the circuit court judgment and orders.[9] Thereafter, Avery petitioned this court for review which was denied on April 27, 1999.

¶ 12. Over 12 years after his conviction, on October 31, 2007, Avery filed a motion under Wis. Stat. § 974.06 (2005–06) for a new trial based on the theories of newly discovered evidence and in the interest of justice. His motion was based on analysis of VISAR-enhanced[10] frames from the video of the robbery at Malone's Fine Foods (the video). Gene Grindstaff[11] (Grindstaff) analyzed the video using digital photogrammetry, and concluded that the person in the video believed to be Avery (the robber) was several inches shorter than Avery.

¶ 13. On February 1, 2008, the circuit court denied Avery's motion for a new trial. Avery appealed and

---

[8] *State v. Machner,* 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

[9] *State v. Avery,* No. 97–0317–CR, unpublished slip op. (Wis. Ct. App. Dec. 1, 1998).

[10] VISAR, or video image stability and registration, is used to improve the quality of images and videos by removing background noises, making the images clearer, and correcting horizontal and vertical camera motion.

[11] Grindstaff was qualified as an expert by the circuit court. He has a bachelor's and master's degree in electrical engineering, he graduated from the United States Air Force Metrology School, he is a certified metrologist (the science of measurement), and he teaches courses at the FBI and CIA on how to make measurements using his company's software.

on March 20, 2009, the court of appeals reversed the postconviction order and remanded the matter, concluding that Avery had made a prima facie claim of newly discovered evidence, and that he was entitled to an evidentiary hearing. In March 2010, the circuit court held a four-day evidentiary hearing.

¶ 14. At the hearing, Grindstaff testified that he conducted an analysis of the video. He explained how he applied the VISAR software to enhance the images and then used photogrammetry to estimate the robber's height. He explained the inherent uncertainties in photogrammetry analysis and the steps he took to minimize inaccuracies in his measurements. For instance, his analysis was based on images where the robber's foot appeared to be against the door frame and where the robber was standing, not walking. Grindstaff estimated that the robber was five feet, ten and one-half inches, with a one-inch margin of error. Grindstaff did not believe the robber could have been six feet, three inches tall, Avery's height.

¶ 15. The court also heard testimony from the State's witness, Richard Vorder Bruegge (Vorder Bruegge).[12] Vorder Bruegge conducted his own analysis of the robber's height and reviewed Grindstaff's analysis. Vorder Bruegge similarly explained his method of enhancing the video then applying photogrammetry to the images to determine the robber's height. He explained the inherent uncertainties in the process, including the low-quality video; obstructions; out of plane error; that the process works best when both feet are in view and planted on the ground; that the process works best when the robber has his shoulders back, locked knees,

---

[12] Vorder Bruegge was qualified as an expert by the circuit court. He works in the digital-evidence section of the FBI, has a Ph.D. in geological sciences, and has extensive training in photogrammetry.

and is standing close to an object that can be used as a scale; and that to produce the most accurate estimate of the robber's height, the expert must know the height of the camera. Vorder Bruegge testified that these factors made the analysis of the Malone's video less certain. Vorder Bruegge analyzed images other than those analyzed by Grindstaff because he did not believe Grindstaff's images would produce the most accurate estimate. Vorder Bruegge estimated that the robber in the video was six feet, one-half inch, with a one-inch margin of error, but he did not rule out that the robber could be Avery's height.[13]

¶ 16. On March 11, 2010, the circuit court concluded that Avery was not entitled to new trial on the basis of newly discovered evidence. It concluded that the photogrammetry evidence met the four prongs of the newly-discovered evidence test, but that there was not a reasonable probability that a jury would have reasonable doubt as to Avery's guilt.[14] The circuit court

---

[13] The circuit court also heard testimony from several other witnesses that Avery could not be the robber in the video for a variety of reasons. We agree with the circuit court that since this testimony was available at the time of the trial, it did not qualify as newly discovered evidence. *See State v. Love,* 2005 WI 116, ¶ 43, 284 Wis. 2d 111, 700 N.W.2d 62 (requiring "newly discovered evidence" to be discovered after the conviction).

[14] To prevail on a claim for newly discovered evidence, a defendant must first prove, by clear and convincing evidence, that "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." *Love,* 284 Wis. 2d 111, ¶ 43. (citation omitted). If the defendant makes this showing, "the circuit court must determine whether a reasonable probability exists that a different result would be reached in a trial." *Id.,* ¶ 44 (citation omitted). The State does not challenge that the photogrammetry evidence meets the four prongs of the test; it challenges only the final test.

noted its belief that photogrammetry is an inherently subjective analysis:

> And Vorder Brugge [sic] . . . says Grindstaff didn't take into account things such as whether or not somebody is out of plane, how high was the camera, how far was the camera from the door, the posture of the subject. A big assumption is made that his foot is against the wall. You can't tell from even the enhanced video as to whether or not his knees are bent, even the knee you can see, because of the baggy pants that he's wearing. You can't tell if he's bent over from the knees, from the waist, from the neck. . . .
>
> . . . These are all variables which affect the reliability of the analysis of Mr. Grindstaff.

¶ 17. The circuit court weighed the photogrammetry evidence against the evidence at trial: Hamdan's identification, police officers' testimony of Simmons's identification, Avery's confession, Avery's written apology, Avery's apology to his mother, Avery's alibi defense, and Avery's retraction of his confession. The circuit court concluded that the new evidence is "simply not going to make a difference." The new evidence was "not reliable enough." The circuit court stated that photogrammetry is "an inexact science," unlike DNA.

¶ 18. At a hearing on July 1, 2010, the circuit court also denied Avery's request for a new trial in the interest of justice. The circuit court stated that granting a new trial in the interest of justice is done only in exceptional cases. It stated that the photogrammetry evidence did not "destroy" the State's case, but merely "chip[ped] away" at the case and thus, was not an exceptional case so as to warrant a new trial.

¶ 19. In October 2011, the court of appeals reversed and remanded for a new trial. *State v. Avery,* 2011 WI App 148, 337 Wis. 2d 560, 807 N.W.2d 638.

Concerning the newly-discovered evidence argument, the court of appeals determined that the circuit court improperly weighed the credibility of Grindstaff against the credibility of Vorder Bruegge. *Id.,* ¶ 34. It concluded that the circuit court erroneously exercised its discretion because it is the jury's task to weigh the credibility of testimony. *Id.* The court of appeals concluded that Avery was entitled to a new trial based on the photogrammetry evidence because "if a jury believes the height of the video suspect as put forth by expert analysis of new video enhancement technology, it is reasonably probable that a reasonable doubt as to Avery's guilt would exist." *Id.,* ¶ 35. The court of appeals also concluded that Avery was entitled to a new trial in the interest of justice because the "jury was precluded from hearing photogrammetry evidence," and therefore, the real controversy—Avery's involvement in the robberies—was not fully tried. *Id.,* ¶ 45.

¶ 20. Judge Brennan dissented from the court of appeals' decision. *Id.,* ¶ 47. As to the newly-discovered evidence claim, she concluded that the majority's analysis took the circuit court's comment out of context. *Id.,* ¶ 51. Instead of weighing the credibility of one expert against the other, Judge Brennan determined that the circuit court was balancing the new evidence, which is unlike DNA because it is an inexact science, against the old evidence, which the circuit court found to be strong. *Id.* Judge Brennan agreed with the circuit court, and concluded that the new evidence would not create a reasonable doubt as to Avery's guilt. *Id.,* ¶ 55. She also concluded that Avery was not entitled to a new trial in the interest of justice because the real controversy of Avery's identification had been fully tried. *Id.,* ¶¶ 57–58. The State had presented strong evidence that included two eyewitnesses and Avery's confession;

Avery presented an alibi defense and recanted his confession. *Id.,* ¶ 58. Judge Brennan concluded that the real controversy was fully tried because the jury had the opportunity to hear all of that evidence and made its own credibility determination when it found him guilty. *Id.*

¶ 21. The State petitioned this court for review and we granted the petition on February 23, 2012.

## II. STANDARD OF REVIEW

¶ 22. Avery requests a new trial because the photogrammetry evidence constitutes newly discovered evidence that creates a reasonable probability that the jury would have a reasonable doubt as to Avery's guilt. The decision to grant or deny a motion for a new trial based on newly discovered evidence is committed to the circuit court's discretion. *State v. Plude,* 2008 WI 58, ¶ 31, 310 Wis. 2d 28, 750 N.W.2d 42. We review the circuit court's determination for an erroneous exercise of discretion. *State v. McCallum,* 208 Wis. 2d 463, 473, 561 N.W.2d 707 (1997).

¶ 23. Avery also contends that he is entitled to a new trial in the interest of justice because the effect of the photogrammetry evidence is that the real controversy was not fully tried. The court of appeals has the discretionary power to reverse a conviction in the interest of justice. Wis. Stat. § 752.35;[15] *State v. Armstrong,* 2005 WI 119, ¶ 113, 283 Wis. 2d 639, 700 N.W.2d 98. We review a discretionary determination for an erroneous

[15] All subsequent references to the Wisconsin Statutes are to the 2009–10 version unless otherwise indicated.

exercise of discretion. *See Johnson v. Cintas Corp. No. 2,* 2012 WI 31, ¶ 22, 339 Wis. 2d 493, 811 N.W.2d 756. The court erroneously exercises its discretion when it applies the wrong legal standard or makes a decision not reasonably supported by the facts of record. See *id.; State v. McConnohie,* 113 Wis. 2d 362, 371, 334 N.W.2d 903 (1983).

## III. ANALYSIS

### A. Newly Discovered Evidence

■

¶ 24. We conclude that there is not a reasonable probability that a jury, looking at both the evidence presented at trial and the new digital photogrammetry evidence, would have a reasonable doubt as to Avery's guilt.

■

¶ 25. To set aside a judgment of conviction based on newly discovered evidence, the evidence must be sufficient to establish that the defendant's conviction resulted in a "manifest injustice." *Plude,* 310 Wis. 2d 28, ¶ 32 (citation omitted). In a motion for a new trial based on newly discovered evidence, the defendant must prove, by clear and convincing evidence, that " '(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative.' " *Id.* (quoting *McCallum,* 208 Wis. 2d at 473). If the defendant is able to make this showing, then "the circuit court must determine whether a reasonable probability exists that a different result would be reached in a trial." *McCallum,* 208 Wis. 2d at 473. A

reasonable probability of a different result exists if there is a reasonable probability that a jury, looking at both the old and the new evidence, would have a reasonable doubt as to the defendant's guilt. *State v. Love,* 2005 WI 116, ¶ 44, 284 Wis. 2d 111, 700 N.W.2d 62. A court reviewing the newly discovered evidence should consider whether a jury would find that the evidence "had a sufficient impact on other evidence presented at trial that a jury would have a reasonable doubt as to the defendant's guilt." *Plude,* 310 Wis. 2d 28, ¶ 33. While the court must consider the new evidence as well as the evidence presented at trial, the court is not to base its decision solely on the credibility of the newly discovered evidence, unless it finds the new evidence to be incredible. *See McCallum,* 208 Wis. 2d at 474–75.

¶ 26. For example, in *McCallum,* the defendant was convicted of second-degree sexual assault. *Id.* at 468. The State's primary evidence of guilt was the victim's statement. *Id.* After the defendant entered an Alford plea, the victim recanted her accusation. *Id.* The circuit court denied the defendant's motion to withdraw his plea, finding that the victim's recantation was less credible than her accusation. *Id.* at 474. This court concluded that the circuit court erred in basing its decision solely on the victim's recantation being less credible than her accusation. *Id.* at 474–75. This court remanded the matter to the circuit court for a determination of whether there was a reasonable probability that a jury would have a reasonable doubt as to McCallum's guilt. *Id.* at 480.

¶ 27. Similarly, in *Edmunds,* the court of appeals concluded that the circuit court improperly weighed the credibility of the witnesses. *State v. Edmunds,* 2008 WI App 33, ¶ 18, 308 Wis. 2d 374, 746 N.W.2d 590. Edmunds was convicted of first-degree reckless homicide

based on expert testimony that a child had died of shaken baby syndrome while in Edmunds' care. *Id.,* ¶¶ 2–4. Ten years after her conviction, Edmunds brought a motion for a new trial based on medical testimony that now challenged whether the cause of death was shaken baby syndrome. *Id.,* ¶ 6. Edmunds' newly discovered evidence consisted of six expert witnesses, who testified that "there is now significant debate in the medical community" concerning shaken baby syndrome. *Id.* The circuit court weighed the credibility of Edmunds' new experts and the credibility of the State's new expert, and it denied Edmunds' motion after finding that the State's new expert was more convincing. *Id.,* ¶ 18. The court of appeals reversed, concluding that it was improper to decide whether a new trial is warranted by weighing the State's new evidence against Edmunds' new evidence. *Id.* Instead, the court of appeals concluded "that the record establishes that there is a reasonable probability that a jury, looking at both the new medical testimony and the old medical testimony, would have a reasonable doubt as to Edmunds' guilt." *Id.,* ¶ 23.

██

¶ 28. A reasonable doubt as to a defendant's guilt has been found to exist when the reliability of a witness critical to the State's case is completely called into question by newly discovered evidence, such as that witness's false credentials. For example, in *Plude,* the main issue at trial was whether Plude drowned his wife Genell by forcing her head in the toilet. 310 Wis. 2d 28, ¶ 4. The testimony of several doctors was inconclusive as to the cause of death, but the testimony of the State's expert, Saami Shaibani, was that Plude drowned his wife. *Id.,* ¶ 25. Shaibani testified that he was an expert in "injury mechanism analysis," a combination of phys-

ics, trauma, and engineering. *Id.*, ¶ 23. He conducted a series of experiments and concluded that Genell could not have inhaled toilet bowl water on her own. *Id.*, ¶ 37. After Plude was convicted, newly discovered evidence revealed that Shaibani falsified his credentials. *Id.*, ¶ 36. This court concluded that "in a trial rife with conflicting and inconclusive medical expert testimony . . . there exists a reasonable probability that, had the jury discovered that Shaibani lied about his credentials, it would have had a reasonable doubt as to Plude's guilt." *Id.*

¶ 29. The State argues that Avery is not entitled to a new trial based on newly discovered photogrammetry evidence because the newly discovered evidence is not enough to overcome the strong evidence at trial.

¶ 30. Avery argues that he is entitled to a new trial based on the newly discovered evidence because if the jury believes that the robber is shorter than Avery, Avery would not be found guilty.

¶ 31. In this case, it is undisputed that the four prongs of the newly-discovered evidence test are satisfied. First, the photogrammetry evidence was "discovered after conviction" because in 1994, experts could not have enhanced the images and applied photogrammetry to estimate the robber's height. Both Grindstaff and Vorder Bruegge testified that in 1994, the software used to enhance the images was not available, and the process would have been prohibitively expensive. Second, Avery was not negligent in seeking the evidence because it was not available at the time of his trial. Third, the evidence is material to the issue of Avery's participation in the robberies. Fourth, the evidence is not merely cumulative. There was no evidence in the trial regarding the robber's height.

¶ 32. The parties dispute the ultimate question of whether there is a reasonable probability that a jury, looking at the evidence presented at trial and the new digital photogrammetry evidence, would have a reasonable doubt as to Avery's guilt.[16] The circuit court has discretion to grant a new trial based on newly discovered evidence, and we cannot say that it erroneously exercised its discretion here. *Plude,* 310 Wis. 2d 28, ¶ 31; *McCallum,* 208 Wis. 2d at 473. Not all new evidence or new technology warrants a new trial. The question is not whether the evidence *could* create a reasonable doubt. When weighing the new evidence against the evidence presented at trial, we cannot say that the circuit court erroneously exercised its discre-

---

[16] The State argues that "reasonable probability" means it is more likely than not a jury would have a reasonable doubt as to a defendant's guilt. In support of its argument, the State cites *State v. [Steven A.] Avery,* 213 Wis. 2d 228, 570 N.W.2d 573 (Ct. App. 1997), and *Strickland v. Washington,* 466 U.S. 668, 693–94 (1984) ("[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case. This outcome-determinative standard has several strengths. . . . [I]t comports with the widely used standard for assessing motions for new trial based on newly discovered evidence.").

Avery argues that the standard is whether the new evidence undermines the confidence in the outcome. *See Kyles v. Whitley,* 514 U.S. 419, 434 (1995) (defining "reasonable probability" as undermining confidence in the result); *State v. Armstrong,* 2005 WI 119, ¶ 162, 283 Wis. 2d 639, 700 N.W.2d 98 (withdrawing language from *[Steven A.] Avery* that a defendant must prove a reasonable probability of a different outcome by clear and convincing evidence).

We need not decide this issue because even under the definition of "reasonable probability" favorable to Avery—that the new evidence undermines the confidence in the outcome—we conclude that Avery is not entitled to a new trial based on the newly discovered evidence.

tion when it concluded that the photogrammetry evidence *would* not create a reasonable doubt in the minds of the jury.

¶ 33. We disagree with the court of appeals' determination that "[b]y concluding that Grindstaff's opinions were *'not reliable enough'* to entitle Avery to a new trial, the trial court gave one opinion from a credible witness greater weight than a competing opinion from a different credible witness." *Avery,* 337 Wis. 2d 560, ¶ 31. Instead, we conclude that the circuit court did not merely weigh the credibility of the experts. *See id.,* ¶ 51 (Brennan, J., dissenting). The circuit court did not conclude that the new evidence was less credible than the old evidence or that one expert was more credible than another. *See Edmunds,* 308 Wis. 2d 374, ¶ 18; *McCallum,* 208 Wis. 2d at 474–75. In fact, a circuit court must consider the new evidence in order to properly determine whether the newly discovered evidence warrants a new trial. In so doing, the circuit court here noted that the photogrammetry evidence was different than DNA or a third-party confession. Indeed, unlike DNA or a third-party confession, the photogrammetry evidence here depends upon dozens of different variables. A different or incorrect assumption on even one variable could lead to a different result.

¶ 34. The circuit court correctly balanced the photogrammetry evidence against the evidence presented at trial. The court considered the two witness identifications at trial of Avery as the robber. Hamdan testified that before he was shot, he looked at Avery two times from two to three feet away. Hamdan identified Avery as the man who kicked his cousin and then stood by the door. Hamdan's testimony was corroborated by events in the video. While Simmons recanted her identification, the circuit court considered testimony of police

officers that Simmons identified Avery in prior interviews, that Simmons knew Avery from the neighborhood, and that Simmons was fearful to testify against Avery. In addition, Avery provided a detailed confession. Avery confessed to details of the robbery that were not on the video. He knew the names or nicknames of the other robbers, and he told police what the robbers did before and after the robberies. Avery wrote an apology and also called his mother after his confession to apologize to her that he had "gotten involved." While the video was used at trial, it was not used to identify Avery. In fact, the State specifically asked the jury not to identify Avery from the video because it was of such poor quality.

¶ 35. Avery's defense included alibi witnesses and his own testimony recanting his confession. The circuit court noted that Avery's attorney "did an admirable job attacking the circumstances of the confession to the jury and they didn't buy it." Three witnesses testified to seeing Avery at North Division High School watching basketball shortly before the Malone's robbery. Two other witnesses testified that Avery was at home during the time frame of the Attari robbery. Avery also testified to his whereabouts during both robberies and to why he recanted his confession. The jury heard all of this evidence, and they still found him guilty.

¶ 36. The State's evidence in this case was far stronger than the State's evidence in *McCallum, Edmunds,* or *Plude*. In those cases, where the court afforded a new trial based on newly discovered evidence, the newly discovered evidence struck at the heart of the State's evidence at trial. Quite unlike those cases, the photogrammetry evidence here does not create a reasonable probability that a jury, looking at

430

the old evidence and the newly discovered evidence, would have a reasonable doubt as to Avery's guilt.

## B. Interest of Justice

██

¶ 37. We also conclude that Avery is not entitled to a new trial in the interest of justice because the controversy was fully tried even though the jury did not hear the photogrammetry evidence.

██ ██

¶ 38. The supreme court and the court of appeals may set aside a conviction through the use of our discretionary reversal powers, though the circuit court does not have such discretionary powers.[17] *See State v. Burns,* 2011 WI 22, ¶ 24, 332 Wis. 2d 730, 798 N.W.2d 166; *State v. Henley,* 2010 WI 97, ¶ 98, 328 Wis. 2d 544,

---

[17] The State argues that the court of appeals may not reverse a criminal conviction in the interest of justice on a motion made under Wis. Stat. § 974.06. The State relies upon *State v. Allen,* 159 Wis. 2d 53, 464 N.W.2d 426 (Ct. App. 1990). However, *State v. Armstrong* is instructive on this issue: "we need not decide whether our statutory power is constrained according to *Allen* because this court has 'both inherent power and express statutory authority to reverse a judgment of conviction and remit a case for a new trial in the interest of justice.'" 2005 WI 119, ¶ 113, 283 Wis. 2d 639, 700 N.W.2d 98 (quoting *State v. Hicks,* 202 Wis. 2d 150, 159, 549 N.W.2d 435 (1996)). "This court has recently reaffirmed that our inherent power to reverse in the interest of justice is not limited to a direct appeal." *State v. Maloney,* 2006 WI 15, ¶ 14, 288 Wis. 2d 551, 709 N.W.2d 436. The discretionary reversal power of this court and the court of appeals is coterminous. *Armstrong,* 283 Wis. 2d 639, ¶ 113; *Vollmer v. Luety,* 156 Wis. 2d 1, 17–18, 456 N.W.2d 797 (1990) ("[W]e conclude that, because secs. 751.06 and 752.35, Stats., are identical, the legislature did not intend for the court of appeals' power to reverse under sec. 752.35 to be less than that of the supreme court under sec. 751.06.").

787 N.W.2d 350. However, such discretionary reversal power is exercised only in "exceptional cases." *Id.*, ¶ 25; *State v. Hicks,* 202 Wis. 2d 150, 161, 549 N.W.2d 435 (1996). The power to grant a new trial in the interest of justice is to be exercised "infrequently and judiciously." *State v. Ray,* 166 Wis. 2d 855, 874, 481 N.W.2d 288 (Ct. App. 1992). "This court approaches a request for a new trial with great caution. We are reluctant to grant a new trial in the interest of justice. . . ."[18] *Armstrong,* 283 Wis. 2d 639, ¶ 114 (citation omitted).

¶ 39. The real controversy here was fully tried. To prove Avery's guilt, the State presented evidence in the form of eyewitness identifications, officers' testimony, Avery's confession, Avery's written apology, and Avery's apology to his mother for getting involved.

¶ 40. Avery presented an alibi defense at trial. Three witnesses testified to seeing Avery at North Division High School watching basketball shortly before the Malone's robbery. Two other witnesses testified that Avery was at home during the time frame of the Attari robbery. Avery also testified to his whereabouts during both robberies and to why he recanted his confession. "The jurors had the opportunity to hear all of that evidence and made their own credibility deter-

---

[18] This court may grant a new trial in the interest of justice (1) whenever "the real controversy has not been fully tried," or (2) whenever "it is probable that justice has for any reason miscarried." Wis. Stat. § 751.06. Cases where the real controversy has not been fully tried have generally been limited to two situations: (1) when the jury was erroneously denied the opportunity to hear important evidence bearing on an important issue in the case or (2) when the jury had before it evidence not properly admitted that "so clouded" a crucial issue that it may be fairly said that the real controversy was not tried. *Hicks,* 202 Wis. 2d at 160.

mination when they found him guilty." *Avery,* 337 Wis. 2d 560, ¶ 58 (Brennan, J., dissenting).

¶ 41. Avery's new photogrammetry evidence does not meet the standard set forth in *Hicks* or *Armstrong.* Clearly, it does not "discredit[] one of the pivotal pieces of evidence forming the foundation of the State's case." *Hicks,* 202 Wis. 2d at 171. In *Hicks* and *Armstrong,* the State "assertively and repetitively" used physical evidence to prove a defendant's guilt. That specific evidence later turned out to be seriously compromised. *See also Maloney,* 288 Wis. 2d 551, ¶ 40 ("[U]nlike *Hicks* and *Armstrong,* where the newly discovered evidence compromised evidence on which the prosecution relied, Maloney has alleged no facts that would substantiate allegations that *evidence on which the prosecution relied was compromised.*").

¶ 42. The video was not used at trial for identification purposes. Though the jury saw the video of the Malone's robbery, the State asked the jury not to make identifications from the video because it was of such poor quality. We have no indication that the video played any part in the jury's verdict. The State did not "assertively and repetitively" use the video of the Malone's robbery to prove Avery's identification. Moreover, the photogrammetry evidence does not discredit two witness identifications of Avery as the robber, Avery's confession, his written apology, or his call apologizing to his mother for getting involved. At most, the photogrammetry evidence "chip[s] away" at the State's case. *Hicks,* 202 Wis. 2d at 171.

¶ 43. In *Hicks,* this court granted the defendant a new trial in the interest of justice when subsequent DNA tests refuted hair evidence the State presented repeatedly at trial as being "consistent" with the defendant's hair. *Id.* at 153. The hair evidence at trial

433

was critically important to the State's case. Hicks was convicted of burglary, robbery, and two counts of sexual assault. *Id.* at 152. At trial, the victim, D.F., testified that she heard a knock at her door, that she saw a black man standing outside, that the man said he was her upstairs neighbor, that he came in to use her phone, and that he assaulted her. *Id.* at 152–54. D.F., a white female, had limited visual contact with the assailant, but she picked Hicks out of a lineup two days after the assault. *Id.* at 154.

¶ 44. During the investigation, the police found several hairs in D.F.'s apartment. *Id.* One "Negro" head hair was found on D.F.'s comforter, and four "Negro" pubic hairs were found in the vacuum sweepings of D.F.'s apartment approximately 15 days after the assault. *Id.* During trial, an analyst testified that four of the hairs were "consistent" with Hicks' hair, and one hair was "similar" to Hicks' hair. *Id.* at 154, 166. Additionally, a "Caucasian" head hair was found inside the pants Hicks was wearing when he was arrested, and the analyst testified that this hair was "consistent" with D.F.'s hair. *Id.* at 154. The hairs were not tested for DNA. *Id.* at 155.

¶ 45. The State's theory at trial was that all of the hairs came from the same person, Hicks. *Id.* at 165–66. At trial, the State relied heavily on the hair evidence and argued that the hair was "strong" and "powerful" evidence of Hicks' guilt. *Id.* at 167. In its opening statement, the State told the jury that hairs found in D.F.'s apartment were "consistent with the hair of Anthony Hicks." *Id.* at 165. An analyst testified that the hairs found at the crime scene were consistent with Hicks' hair, and, over objection, an enlarged photograph of the hair evidence was shown to the jury. *Id.* at 166. The State argued that "I don't see, here, any prejudice,

except for the fact that it's probative. And it (the hair evidence) is probative evidence. That's for sure!" *Id.* at 167. During closing argument, the State again emphasized that Hicks should be convicted because the hairs "were compared and found consistent" to both Hicks' hair and the victim's hair. *Id.* at 167–68.

¶ 46. Hicks' defense at trial was that he had never been in D.F.'s apartment. *Id.* at 163. He presented alibi testimony but none for the exact time of the offense. *Id.* at 155. The jury convicted Hicks. *Id.* at 152.

¶ 47. Postconviction, an analyst conducted DNA tests on the five hairs. *Id.* at 156. The DNA evidence excluded Hicks as the source of two of the hairs. *Id.* The other hairs did not yield sufficient DNA for analysis. *Id.* Hicks then brought a motion for a new trial in the interest of justice, arguing that the real controversy— whether he was the man that entered D.F.'s apartment and assaulted her—had not been fully tried. *Id.* at 157–58. The circuit court rejected his argument. *Id.* at 152. The court of appeals reversed, granting Hicks a new trial, and the State appealed to this court. *Id.* at 157.

¶ 48. This court agreed with the court of appeals and concluded that it was an exceptional case. *Id.* at 161. "[T]he jury did not hear important DNA evidence that bore on an important issue of the case," and "the testimony the jury heard with respect to the hair as affirmative proof of guilt was inconsistent with what the later DNA analysis revealed, thus clouding the crucial issue of identification." *Id.* The court noted:

> By itself, the fact that Hicks obtained post-conviction DNA evidence might not persuade us to remand this matter for a new trial in the interest of justice. The determinative factor in the present case is

435

the fact that the State assertively and repetitively used hair evidence throughout the course of the trial as affirmative proof of Hicks' guilt. The State went to great lengths to establish that the hairs found at the scene came from the assailant. In opening and closing arguments, the State relied heavily upon its expert's opinion that the hairs found at the scene were consistent with known standards provided by Hicks. At various times, the State referred to a 'match' between the hairs, thus elevating and highlighting the importance of the hair evidence to the jury.

The combination of these two factors leads us to the conclusion that the real controversy was not fully tried.

*Id.* at 164. The DNA evidence did more than "chip away at the accumulation of evidence produced by the State to prove guilt. The DNA test result, in conjunction with D.F.'s testimony about the source of the Negro hairs in her apartment, discredits one of the pivotal pieces of evidence forming the foundation of the State's case." *Id.* at 171. Such is not the case with respect to Avery's photogrammetry evidence.

¶ 49. Similar to *Hicks,* in *Armstrong,* the State used physical evidence forcefully during the trial to prove that Armstrong was guilty of the sexual assault and murder of Charise Kamps. 283 Wis. 2d 639, ¶¶ 87–89. Later tests disproved Armstrong as the source of two hairs and semen found near the body, and he brought a motion for a new trial in the interest of justice based on the DNA evidence. *Id.,* ¶¶ 94–95.

¶ 50. The State's case against Armstrong consisted of five parts:

(1) that Armstrong could not have been at Kamps' apartment before her murder; (2) two witnesses made observations that placed Armstrong at Kamps' apart-

ment around the time she was murdered; (3) physical evidence conclusively and irrefutably established Armstrong's guilt, including (a) a fingerprint identified as Armstrong's found on a water bong in Kamps' apartment; (b) semen stains on the victim's bathrobe that came from a similar secretor type as Armstrong; (c) four head hairs found in the apartment characterized by the State's expert as "consistent" and "similar" to Armstrong's; (d) traces of blood underneath Armstrong's fingernails and toenails detected the evening following the murder; (4) Armstrong had a romantic interest in Kamps that she did not return; and (5) Armstrong paid Kamps $400 in repayment of a debt and following her murder, the $400 could not be found in her apartment, while Armstrong made a $315 cash deposit the next day.

*Id.,* ¶ 8.

¶ 51. Critical to the State's case and the conviction was certain physical evidence. Armstrong's fingerprint was found on a bong in Kamps' apartment. *Id.,* ¶ 64. A robe next to Kamps' body tested positive for semen, and the semen was consistent with a type-A secretor. *Id.,* ¶ 65. An analyst testified that Armstrong, as well as 80 percent of the population, are type-A secretors. *Id.* The State also presented evidence that Armstrong had blood underneath his fingernails and toenails within a day after the murder. *Id.,* ¶¶ 68–69. Finally, the State presented hair evidence. Police recovered a total of five hairs, all head hairs, that were "consistent" with Armstrong's hair. *Id.,* ¶¶ 80–83. The hairs were recovered from the bathrobe belt draped over Kamps' body, the bathroom, the bodily fluid around Kamps' body, and the fan. *Id.*

¶ 52. Similar to *Hicks,* the State used the physical evidence "assertively and repetitively as affirmative proof of Armstrong's guilt." *Id.,* ¶ 139. During closing

437

arguments, the State emphasized the physical evidence and stated: "There was physical evidence at the scene. Physical evidence to demonstrate conclusively that Ralph Armstrong is the person who murdered Charise Kamps. There is also physical evidence on Ralph Armstrong that ties him precisely with the scene of the crime." *Id.,* ¶ 140. The State told the jury that "[t]wo of the defendant's hairs" were on the bathrobe belt across Kamps' body. *Id.,* ¶ 142. The State further argued that semen from a type-A secretor, like Armstrong, was found on the bathrobe next to Kamps' body. *Id.,* ¶ 144. The State told the jury that "there was blood under every fingernail, every single one. That was Charise Kamps' blood." *Id.,* ¶ 143.

¶ 53. In *Armstrong,* the State "flaunted powerful conclusions before the jury that the physical evidence conclusively and irrevocably established Armstrong as the murderer." *Id.,* ¶ 154. The new evidence did more than " 'chip away' " at the accumulation of the State's case, it " 'discredit[ed] one of the pivotal pieces of proof forming the very foundation of the State's case.' " *Id.,* ¶ 155 (quoting *Hicks,* 202 Wis. 2d at 171). Such is not the case with respect to Avery's new photogrammetry evidence.

¶ 54. In the case at issue, Avery argues that the real controversy of his involvement in the robberies was not fully tried because the jury was precluded from hearing the photogrammetry evidence during the trial. Avery argues that we should affirm the court of appeals and grant him a new trial in the interest of justice.

¶ 55. The State argues that this case, unlike *Hicks* and *Armstrong,* is not a truly exceptional one. We agree. The court of appeals erroneously exercised its discretion by granting a new trial in the interest of

justice without undertaking any analysis to determine that this was such an exceptional case.[19]

¶ 56. In both *Hicks* and *Armstrong,* the real controversy was not fully tried. In *Hicks,* the new DNA tests alone were not enough to grant a new trial, but it was the combination of the new evidence with the State's reliance on that specific evidence at trial that made the case so exceptional to warrant a new trial in the interest of justice. 202 Wis. 2d at 164. The same cannot be said with respect to Avery's trial. The jury saw the video, and it did not hear the photogrammetry evidence. However, we cannot say that the photogrammetry evidence discredits a pivotal piece of evidence presented to the jury such that the real controversy was not fully tried. The State did not meaningfully rely on the video at trial and it certainly did not do so with respect to the issue of identification.

---

[19] While the court of appeals need not necessarily use the word "exceptional" in its analysis, it does have an obligation to analyze why a case is so exceptional to warrant a new trial in the interest of justice. In other words, the court of appeals erroneously exercised its discretion by granting a new trial in the interest of justice without properly analyzing why this was such an exceptional case. The court of appeals' analysis seems to simply restate the interest of justice test: "The jury was precluded from hearing photogrammetry evidence because, at the time of trial, the specific technique to sufficiently enhance the video surveillance evidence did not exist. We conclude, as a result, that the real controversy of whether Avery was actually involved in the robberies was not fully tried." *Avery,* 337 Wis. 2d 560, ¶ 45. The court of appeals never analyzed whether the jury was erroneously denied the opportunity to hear important evidence bearing on an important issue in the case, or whether the jury had before it evidence not properly admitted that so clouded a crucial issue that it may be fairly said that the real controversy was not fully tried. *See Hicks,* 202 Wis. 2d at 160.

¶ 57. A new trial is not warranted every time new technology affects evidence admitted at an earlier trial:

It strains the meaning of 'fully tried' to suggest that [a] case was not fully tried because the scientific bases for physical evidence set forth in the trial were only *state-of-the-art at the time of the trial,* but not state-of-the-art at present. Using the majority's standard, the real controversy can never be fully tried because scientific advances in evidence gathering and analysis will continue to improve.

*Armstrong,* 283 Wis. 2d 639, ¶ 188 (Roggensack, J., dissenting).
The judicial system has limited resources, and judicial policy favors finality of convictions. *See Love,* 284 Wis. 2d 111, ¶ 58 (Prosser, J., dissenting). In a truly exceptional case, those interests do not trump the defendant's interest in having the real controversy fully tried. However, this is not such an exceptional case.

¶ 58. Avery's photogrammetry evidence does not discredit a pivotal piece of evidence that the State used "assertively and repetitively" at trial to prove Avery's guilt. *Hicks,* 202 Wis. 2d at 165, 171–72. The photogrammetry evidence, at most, merely "chip[s] away" at the State's case. *Id.* at 171. Thus, the real controversy was fully tried. This is not an exceptional case that warrants granting Avery a new trial in the interest of justice.

## IV. CONCLUSION

¶ 59. We conclude that there is not a reasonable probability that a jury, looking at both the evidence presented at trial and the new digital photogrammetry

evidence, would have a reasonable doubt as to Avery's guilt. We also conclude that the court of appeals erroneously exercised its discretion when it failed to properly analyze whether this was an exceptional case that entitled Avery to a new trial in the interest of justice. Avery is not entitled to a new trial in the interest of justice because the controversy was fully tried even though the jury did not hear the photogrammetry evidence.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 60. DAVID T. PROSSER, J. (*concurring*). This case presents an important issue of statutory construction affecting postconviction review. If the court approves the application of Wis. Stat. §§ 751.06 or 752.35 to postconviction motions under Wis. Stat. § 974.06, it will seriously jeopardize the high standards and finality in § 974.06. I write separately to express this concern.

I

¶ 61. Two statutes, Wis. Stat. § 751.06[1] and Wis. Stat. § 752.35,[2] give the supreme court and the court of appeals, respectively, "discretionary reversal" authority

---

[1] Wisconsin Stat. § 751.06 reads as follows:

> Discretionary reversal. In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

[2] Wisconsin Stat. § 752.35 reads as follows:

441

on appeal. Both appellate courts may "reverse the judgment or order appealed from," "direct the entry of the proper judgment," or remit the case to the trial court for the entry of the proper judgment or for a new trial, "if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried." Wis. Stat. §§ 751.06, 752.35.

¶ 62. There is no dispute that the two statutes apply in a direct appeal from a judgment of conviction and/or a direct appeal from the denial of a postconviction motion under Wis. Stat. § 974.02. The question in dispute is whether the two statutes apply in a collateral attack—that is, in an appeal from a postconviction motion under Wis. Stat. § 974.06. A "yes" answer will undermine this court's decisions in *State v. Escalona-Naranjo,* 185 Wis. 2d 168, 517 N.W.2d 157 (1994), and *State v. Lo,* 2003 WI 107, 264 Wis. 2d 1, 665 N.W.2d 756.

II

¶ 63. The language found in Wis. Stat. § 751.06 first appeared in the Wisconsin Statutes in 1913. *See* ch. 214, Laws of 1913.[3] In the 1925 statutes, the language is located in Wis. Stat. § 251.09. *See* ch. 4, Laws of 1925.

Discretionary reversal. In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

[3] Section 1. There is added to the statutes a new section to read:

This statute was renumbered as Wis. Stat. § 751.06 in § 76, ch. 187, Laws of 1977, and also was amended to read:

751.06. Discretionary reversal. In an appeal in the supreme court, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record, and may direct the entry of the proper judgment or remit the case to the trial court for the entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

§ 76, ch. 187, Laws of 1977.

¶ 64. Wisconsin Stat. § 752.35 was created by § 112, ch. 187, Laws of 1977, to accommodate the newly created court of appeals.

Section 2405m. In any action or proceeding brought to the supreme court by appeal or writ of error, if it shall appear to that court from the record, that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the supreme court may in its discretion reverse the judgment or order appealed from, regardless of the question whether proper motions, objections, or exceptions appear in the record or not, and may also, in case of reversal, direct the entry of the proper judgment or remit the case to the trial court for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with the statutes governing legal procedure, as shall be deemed necessary to accomplish the ends of justice.

§ 1, ch. 214, Laws of 1913.

¶ 65. Several observations should be made about these two statutes.

¶ 66. First, both statutes are unquestionably intended to apply to civil cases as well as criminal cases. *See Hamilton v. State,* 171 Wis. 203, 209, 176 N.W. 773 (1920) (citing § 2405m, supreme court found it "impossible" to say the real controversy was tried before a jury); *Gillett v. Flanner-Steger Land & Lumber Co.,* 159 Wis. 578, 583–84, 150 N.W. 987 (1915) (citing § 2405m, supreme court reversed negligence judgment); *Graber v. Duluth S. Shore & Atl. Ry. Co.,* 159 Wis. 414, 422, 150 N.W. 489 (1915) (citing § 2405m, supreme court stated that statute provides grounds to reverse a civil judgment); *Root v. Saul,* 2006 WI App 106, ¶ 1, 293 Wis. 2d 364, 718 N.W.2d 197 (citing Wis. Stat. § 752.35, court of appeals reversed and remanded for a new trial when the jury was not properly instructed in personal injury case); *State v. Peters,* 2002 WI App 243, ¶¶ 1–2, 258 Wis. 2d 148, 653 N.W.2d 300 (exercising its discretionary reversal power under § 752.35, court of appeals reversed and remanded for a new trial in a homicide case). Consequently, the analysis of these statutes in one context is likely to have implications in the other context.

¶ 67. For example, if the two statutes may be used for collateral attacks in criminal cases, they should be available for collateral attacks in civil cases as well.

¶ 68. *Graff v. Roop,* 7 Wis. 2d 603, 97 N.W.2d 393 (1959), suggests otherwise. In *Graff,* the court considered an appeal from an order in a mandamus action denying a motion for a new trial. The court said:

> The appellant has misconceived the basis on which this court will exercise its discretionary reversal power under sec. 251.09, Stats. This section was not intended

to bring before the court issues which should have been raised by appeal from the judgment involving such issues. *The section presupposes a timely appeal from a judgment involving the issues and should not be the basis of abrogating or rendering inoperative the time within which an appeal must be taken* under sec. 274.01. In the exercise of its discretionary power to reverse, the court can disregard the failure to make proper motions, objections, or exceptions before the trial court, but in such instances there is a judgment properly on review before the court.

*Id.* at 606 (emphasis added) (citation omitted).

¶ 69. In my view, both statutes presuppose a timely appeal, so that discretionary reversal is part of a direct appeal. If this were not true, the court would have to manufacture time limitations for use of the two statutes unless it were to determine that the statutes have no time limitations.

¶ 70. Second, if the statutes are not tied to a direct appeal, the court of appeals will likely be asked, sooner or later, to vacate or overrule a published decision it made on direct appeal when the new appeal is part of a collateral attack on the challenged judgment. The court of appeals might even be asked to overrule a decision of the supreme court.

¶ 71. In *Cook v. Cook,* 208 Wis. 2d 166, 560 N.W.2d 246 (1997), however, this court held that "[t]he supreme court is the only state court with the power to overrule, modify or withdraw language from a previous supreme court case. . . . [O]nly the supreme court . . . has the power to overrule, modify or withdraw language from a published opinion of the court of appeals." *Id.* at 189–90.

¶ 72. *Cook* problems are avoided by confining application of the two statutes to direct appeals.

¶ 73. Third, both statutes are entitled "Discretionary Reversal." Both statutes give an appellate court authority to "reverse *the judgment* or order appealed from." (Emphasis added.) The words "reverse" and "reversal" imply a direct appeal because it is possible to reverse a "judgment" in a direct appeal but it is not possible to "reverse" a "judgment" in an appeal from an order denying a motion under Wis. Stat. § 974.06.[4] The court of appeals in *State v. Gilbert Allen,* 159 Wis. 2d 53, 55–56, 464 N.W.2d 426 (Ct. App. 1990), recognized this limitation in Wis. Stat. § 752.35:

> Our power of discretionary reversal under sec. 752.35, Stats., may be exercised only in direct appeals from judgments or orders. . . . When an appeal is taken from an unsuccessful collateral attack under sec. 974.06, Stats., against a judgment or order, that judgment or order is not before us. All that is before us is an order which refuses to vacate and set the judgment of conviction aside or to grant a new trial or to correct a sentence. Section 752.35 does not permit us to go behind a sec. 974.06 order to reach the judgment of conviction.

¶ 74. Fourth, both statutes explain that the respective appellate courts have discretionary reversal authority "regardless of whether the proper motion or objection appears in the record." Wis. Stat. §§ 751.06, 752.35. This language specifically overrides statutory and common law rules on waiver or forfeiture of objections. *See State v. Schumacher,* 144 Wis. 2d 388, 401, 424 N.W.2d 672 (1988). Again, discretionary reversal

---

[4] Wisconsin Stat. § 974.06(7) provides that, "An appeal may be taken from the order entered on the motion *as from a final judgment.*" (Emphasis added.) This does not mean, however, that the "order" under § 974.06 is the same as a "judgment" under the two discretionary reversal statutes.

446

may be involved on direct appeal. It is less likely that discretionary reversal may be used in a collateral proceeding because there is no statutory language inviting its use after appeal in a collateral proceeding.

¶ 75. Fifth, there are two distinct avenues for relief in the discretionary reversal statutes: (1) the real controversy has not been fully tried, and (2) it is probable that justice has for any reason miscarried. The second avenue—and only the second avenue—requires the appellate court to determine "that there would be a substantial probability that a different result would be likely on retrial." *Id.* (citing *State v. Wyss*, 124 Wis. 2d 681, 741, 370 N.W.2d 745 (1985)); *see also Morden v. Cont'l AG*, 2000 WI 51, ¶ 95, 235 Wis. 2d 325, 611 N.W.2d 659 (citing *Garcia v. State*, 73 Wis. 2d 651, 654, 245 N.W.2d 654 (1976); and *Vollmer v. Luety*, 156 Wis. 2d 1, 16–17, 19, 456 N.W.2d 797 (1990)). Thus, if the discretionary reversal statutes were permitted to be used in collateral attacks to reverse judgments, they could be used in situations where there was no perceived probability of a different result on retrial. Is there any evidence to suggest that the legislature intended such a result?

### III

¶ 76. Having examined why Wis. Stat. §§ 751.06 and 752.35 are not consistent with collateral attack, I turn to Wis. Stat. § 974.06 to show why it does not mesh with the two "discretionary reversal" statutes.

¶ 77. Wisconsin Stat. § 974.06 was created by the legislature in 1969.[5] The history of the statute is discussed in *Escalona-Naranjo*, 185 Wis. 2d at 176–78,

---

[5] The legislature created Wis. Stat. § 974.06 in § 63, ch. 255, Laws of 1969, effective July 1, 1970.

181–82, and *Lo,* 264 Wis. 2d 1, ¶¶ 16–22. *See also* Angela B. Bartell, Comment, *Wisconsin Post Conviction Remedies—Habeas Corpus: Past, Present and Future,* 1970 Wis. L. Rev. 1145; Heather M. Hunt, Note, *State v. Escalona-Naranjo: A Limitation on Criminal Appeals in Wisconsin?,* 1997 Wis. L. Rev. 207. For a general discussion of the procedure under Wis. Stat. § 974.06, see Howard B. Eisenberg, *Post-Conviction Remedies in the 1970's,* 56 Marq. L. Rev. 69, 78–83 (1972).

¶ 78. "With the exception of subsection (4), [Wis. Stat. §] 974.06 is a direct adaptation of 28 U.S.C. sec. 2255." *Escalona-Naranjo,* 185 Wis. 2d at 176 (footnotes omitted). But "the language of § 974.06(4) was adapted from section 8 [Waiver of or Failure to Assert Claims] of the 1966 [Uniform Post-Conviction Procedure Act], even though the UPCPA was not adopted in its entirety by the Wisconsin legislature." *Lo,* 264 Wis. 2d 1, ¶ 18 (quoting *Escalona-Naranjo,* 185 Wis. 2d at 177–78) (internal citation omitted).

¶ 79. The policy behind the subsection is thoroughly discussed in *Escalona-Naranjo* and *Lo;* namely, "a goal of finality in the criminal appeals process. This finality is inherently related to the purpose of vindicating justice via a simplified and adequate postconviction remedy." *Lo,* 264 Wis. 2d 1, ¶ 46. This remedy requires that a defendant "raise all grounds regarding postconviction relief in his or her original, supplemental or amended motion," absent a sufficient reason why a claim was not raised earlier. *Id.* (citing *Escalona-Naranjo,* 185 Wis. 2d at 177); Wis. Stat. § 974.06(4).

¶ 80. Several points must be made about Wis. Stat. § 974.06 in the context of this case.

¶ 81. First, the statute was adopted in 1969, more than half a century after the supreme court discretionary reversal statute became law in 1913. If there is a

conflict between the statutes, the latter statute has the effect of modifying the application of the former statute.

¶ 82. Second, the scope of a Wis. Stat. § 974.06 motion is limited by § 974.06(1), as interpreted by Wisconsin court decisions. "A sec. 974.06 motion is limited in scope to matters of jurisdiction or constitutional dimensions." *Lo,* 264 Wis. 2d 1, ¶ 23 (quoting *Peterson v. State,* 54 Wis. 2d 370, 381, 195 N.W.2d 837 (1972)). *See also State v. Langston,* 53 Wis. 2d 228, 191 N.W.2d 713 (1971); *State v. Klimas,* 94 Wis. 2d 288, 308, 288 N.W.2d 157 (Ct. App. 1979).

¶ 83. Wisconsin Stat. §§ 751.06 and 752.35 do not mesh with Wis. Stat. § 974.06 because these discretionary reversal statutes are *not* limited "to matters of jurisdiction or constitutional dimensions." After all, they apply in civil cases. *See* ¶ 7, *supra.*

¶ 84. Third, Wis. Stat. § 751.06 *might* have meshed with Wis. Stat. § 974.06 if the Wisconsin legislature had adopted section 1 of the 1966 Uniform Post-Conviction Procedure Act, which read in part:

§ 1. [Remedy—To Whom Available—Conditions].

(a) Any person who has been convicted of, or sentenced for, a crime and who claims:

. . . .

(4) that there exists evidence of material facts, not previously presented and heard, that requires vacation of the conviction or sentence *in the interest of justice*[.]

Unif. Post-Conviction Procedure Act § 1, 11 U.L.A. 666 (Master ed. 2003) (emphasis added).

¶ 85. But, as we noted in *Lo,* Wisconsin chose not to adopt section 1 of the UPCPA. Instead, it adopted language taken directly from 28 U.S.C. § 2255. *Lo,* 264 Wis. 2d 1, ¶ 21. *See* Note, ch. 255, Laws of 1969.

¶ 86. Finally, this court has ruled that a circuit court may apply the principles of Wis. Stat. § 751.06 when considering a motion under Wis. Stat. § 974.02. *State v. Henley*, 2010 WI 97, ¶ 63, 328 Wis. 2d 544, 787 N.W.2d 350. But this court rejected the use of Wis. Stat. § 805.15(1) to introduce interest of justice principles into post-appeal proceedings.

> Allowing motions in the interest of justice under § 805.15(1) at any time renders limitations under § 974.02 and § 974.06 irrelevant. These statutes would make no sense if motions under § 805.15(1) could be brought at any time. No criminal defendant would limit themselves to bringing a motion under § 974.06 . . . *if the broader grounds in § 805.15* were always available. . . .

*Id.,* ¶ 55 (emphasis added). "[T]here is no authority for the circuit court to grant a new trial in the interest of justice under § 974.06." *Id.,* ¶ 98 (Prosser, J., concurring).

¶ 87. Thus, it is not logical to believe that the discretionary reversal statutes give appellate courts power to reverse circuit courts in appeals from Wis. Stat. § 974.06 proceedings.

IV

¶ 88. In this case, the defendant was convicted of two counts of armed robbery at a jury trial in April 1995. He was unsuccessful on appeal. In October 2007 he moved for postconviction relief under Wis. Stat. § 974.06, asking for a new trial based on (1) newly discovered evidence, and (2) the interest of justice.

¶ 89. I have no objection to a motion for a new trial under Wis. Stat. § 974.06, based on newly discovered evidence, if the newly discovered evidence satisfies

the requirements in § 974.06(1) and (4). The majority concludes, however, that "[t]he supreme court and the court of appeals may set aside a conviction through the use of our discretionary reversal powers, though the circuit court does not have such discretionary powers." Majority op., ¶ 38 (footnote omitted). The reference to the circuit court is to the circuit court's limited power under Wis. Stat. § 974.06.

¶ 90. The majority explains the passage in a footnote, which reads:

> The State argues that the court of appeals may not reverse a criminal conviction in the interest of justice on a motion made under Wis. Stat. § 974.06. The State relies upon *State v. Allen,* 159 Wis. 2d 53, 464 N.W.2d 426 (Ct. App. 1990). However, *State v. Armstrong* is instructive on this issue: "we need not decide whether our statutory power is constrained according to *Allen* because this court has 'both inherent power and express statutory authority to reverse a judgment of conviction and remit a case for a new trial in the interest of justice.'" 2005 WI 119, ¶ 113, 283 Wis. 2d 639, 700 N.W.2d 98 (quoting *State v. Hicks,* 202 Wis. 2d 150, 159, 549 N.W.2d 435 (1996)). "This court has recently reaffirmed that our inherent power to reverse in the interest of justice is not limited to a direct appeal." *State v. Maloney,* 2006 WI 15, ¶ 14, 288 Wis. 2d 551, 709 N.W.2d 436. The discretionary reversal power of this court and the court of appeals is coterminous. *Armstrong,* 283 Wis. 2d 639, ¶ 113; *Vollmer v. Luety,* 156 Wis. 2d 1, 17–18, 456 N.W.2d 797 (1990) ("[W]e conclude that, because secs. 751.06 and 752.35, Stats., are identical, the legislature did not intend for the court of appeals' power to reverse under sec. 752.35 to be less than that of the supreme court under sec. 751.06.").

Majority op., ¶ 38 n.17.

¶ 91. In retrospect, *Armstrong* never held that the state's appellate courts have *statutory* authority for discretionary reversal under Wis. Stat. § 974.06. Rather, *Armstrong* said that the supreme court has "both inherent power and express statutory authority to reverse a judgment of conviction and remit a case for a new trial in the interest of justice, even where the circuit court has exercised its power . . . to deny a new trial." *Armstrong*, 283 Wis. 2d 639, ¶ 113 (quoting *State v. Hicks,* 202 Wis. 2d 150, 159, 549 N.W.2d 435 (1996)).

¶ 92. Of course, the supreme court has statutory authority to grant a new trial in the interest of justice where the circuit court has denied a new trial *under Wis. Stat. § 974.02.* But the only case cited by *Armstrong* that arguably supports discretionary reversal in a collateral attack under Wis. Stat. § 974.06 is *State v. McConnohie,* 113 Wis. 2d 362, 334 N.W.2d 903 (1983), a case decided before *Gilbert Allen* and before *Escalona-Naranjo.*

¶ 93. The other cases cited by *Armstrong* are inapplicable. *Hicks* and *State v. Penigar,* 139 Wis. 2d 569, 408 N.W.2d 28 (1987), involved direct appeals, not collateral attacks under Wis. Stat. § 974.06. *Stivarius v. DiVall,* 121 Wis. 2d 145, 358 N.W.2d 530 (1984), was a civil case.

¶ 94. In truth, then, the *Armstrong* court relied exclusively on "inherent authority." *Armstrong,* 283 Wis. 2d 639, ¶ 110 ("We conclude that even if *Gilbert Allen* is correct, we have the inherent authority to order a new trial, even where a defendant's appeal is not direct."). The court added nothing to this analysis in *Maloney.*

¶ 95. In sum, the only basis for the supreme court to exercise discretionary reversal in a case involving Wis. Stat. § 974.06 is the court's inherent power. The majority now bestows the same power on the court of appeals.

¶ 96. If this court claims inherent power to reverse a conviction in the interest of justice in any collateral attack under Wis. Stat. § 974.06, it is asserting appellate power to wholly disregard the limitations in § 974.06. That is a concern worth discussing.

¶ 97. For the foregoing reasons, I respectfully concur.

¶ 98. ANN WALSH BRADLEY, J. (*dissenting*). The majority reverses the court of appeals not because of any legal or factual error. Rather, the majority in essence disregards the standard of review and reverses the court of appeals simply because it does not agree with the outcome.

¶ 99. The standard of review in this case requires us to determine whether the court of appeals erroneously exercised its discretion because it committed a legal or factual error. In order to appear as if it reviews this matter for an erroneous exercise of discretion, the majority takes the court of appeals to task for failing to analyze whether this case is "truly exceptional." Majority op., ¶ 55.

¶ 100. The problem with the majority's analysis is that what constitutes an "exceptional" case is in the eye of the beholder. What the majority is really doing is substituting its own evaluation of whether this is such an exceptional case in place of the court of appeals' reasoned determination that this case warrants a new trial in the interest of justice.

¶ 101. By conducting what is really an independent review, the majority subverts the court of appeals' discretion to order a new trial in the interest of justice. *Vollmer v. Luety,* 156 Wis. 2d 1, 15, 456 N.W.2d 797 (1990). Because a straightforward review for an erroneous exercise of discretion would reveal that the court

of appeals has committed no error of fact or law that requires reversal, I respectfully dissent.

I

¶ 102. The majority correctly sets forth the two-part test for determining whether a new trial should be granted in the interest of justice when the controversy has not been fully tried. Majority op., ¶ 38 n.18. This court has concluded that the real controversy was not fully tried in two situations. *State v. Hicks,* 202 Wis. 2d 150, 160, 549 N.W.2d 435 (1996). First, when the jury was erroneously denied the opportunity to hear important evidence bearing on an important issue in the case. *Id.* Second, when the jury had before it evidence not properly admitted that "so clouded" a crucial issue that it may be fairly said that the real controversy was not fully tried. *Id.*

¶ 103. The majority also correctly states the standard of review for an order of the court of appeals granting a new trial in the interest of justice: we review to determine whether the court of appeals erroneously exercised its discretion. *See* Majority op., ¶ 38. Nevertheless, in the very next paragraph, the majority concludes that "[t]he real controversy here was fully tried," in essence deciding the issue on its merits de novo. *Id.,* ¶ 39.

¶ 104. Although the majority pays lip service to the correct standard of review, its approach to this case is evident from its declaration that Avery asks *this* court to "grant him a new trial in the interest of justice." *Id.,* ¶ 54. Here, however, there is a fly in the majority's ointment—a new trial has already been granted. The court of appeals analyzed this very issue and concluded

that the real controversy was not fully tried. *State v. Avery,* 2011 WI App 148, 337 Wis. 2d 560, ¶ 37, 807 N.W.2d 638.

¶ 105. The majority mines through the facts of *Hicks* and *Armstrong*[1] in an attempt to distinguish the facts in those cases from the facts here. Majority op., ¶¶ 43–53. Ultimately it concludes that unlike *Hicks* and *Armstrong,* this is not a "truly exceptional" case. Majority op., ¶ 55.

¶ 106. The majority then proceeds to independently evaluate the merits of the photogrammetry evidence and its effects on the trial. *Id.,* ¶ 56. Although it acknowledges that the jury saw the video in this case but did not hear the photogrammetry evidence, it dismissively concludes that the photogrammetry evidence does not "discredit[] a pivotal piece of evidence" at trial. *Id.* Because the State "did not meaningfully rely on the video at trial," the majority dismisses the photogrammetry evidence's effect on the proceeding entirely. *Id.* Finally, although it cloaks its conclusion with the term "erroneous exercise of discretion," it determines that this is not an exceptional case and that Avery is not entitled to a new trial in the interest of justice. *Id.,* ¶ 59.

II

¶ 107. The problem with the majority's analysis is that one person's "exceptional" is another person's "routine." The "exceptional" is to be found in the eyes of the beholder. The exact outline of what constitutes an exceptional case is merely a matter of opinion based on one's view of the facts. That is precisely the reason this

[1] *State v. Armstrong,* 2005 WI 119, 283 Wis. 2d 639, 700 N.W.2d 98.

court has traditionally accorded the court of appeals "substantial discretion" and has "liberally construed" its power of discretionary reversal under Wis. Stat. § 752.35.[2] *Vollmer,* 156 Wis. 2d at 15.

¶ 108. In *Vollmer,* this court recognized that the discretionary power of reversal is "compatible with doing justice in an individual case, which is primarily the duty of the court of appeals." *Id.* That power is consistent with the court of appeals' error-correcting function, which this court has recognized means that the court of appeals is the court of last resort in many cases. *State v. Schumacher,* 144 Wis. 2d 388, 408, 424 N.W.2d 672 (1988). The court of appeals is thus accorded "substantial discretion" when it orders a new trial in the interest of justice under Wis. Stat. § 752.35. *Vollmer,* 156 Wis. 2d at 15.

¶ 109. Therefore, the proper role of this court on review is solely to determine whether the court of appeals committed an error of fact or law that requires reversal. *See Stivarius v. DiVall,* 121 Wis. 2d 145, 153 n.5, 358 N.W.2d 530 (1984) (discretionary reversals by the court of appeals are reviewed for an error of law). Because no one argues that an error of fact was committed by the court of appeals, the review in this

---

[2] Wisconsin Stat. § 752.35 states the following:

**Discretionary Reversal.** In an appeal to the court of appeals, if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried, the court may reverse the judgment or order appealed from, regardless of whether the proper motion or objection appears in the record and may direct the entry of the proper judgment or remit the case to the trial court for entry of the proper judgment or for a new trial, and direct the making of such amendments in the pleadings and the adoption of such procedure in that court, not inconsistent with statutes or rules, as are necessary to accomplish the ends of justice.

case should be confined to whether an error of law was committed when the court of appeals granted a new trial because the real controversy was not fully tried. The majority appears to abandon the proper standard of review simply because it disagrees with the result in this case.

¶ 110. Ultimately, the majority today has sent a message to the court of appeals that regardless of the statutory authority given to the court of appeals to grant a new trial in the interest of justice pursuant to Wis. Stat. § 752.35, it should not be entrusted to exercise that discretion. Instead, this court will not be bound by the standard of review and will second-guess the court of appeals' discretionary determination even though there is no mistake of law or fact in its decision.[3]

---

[3] The court of appeals has granted only a handful of new trials in the interest of justice in recent years. *See, e.g., State v. Tanon,* No. 2009AP491, unpublished slip op. (Ct. App. Mar. 18, 2010); *State v. Vandenberg,* No. 2009AP1242, unpublished slip op. (Ct. App. Aug. 24, 2010); *State v. Louis,* No. 2009AP2502–CR, unpublished slip op. (Ct. App. Mar. 15, 2011); *State v. Davis,* 2011 WI App 147, 337 Wis. 2d 688, 808 N.W.2d 130; *State v. Jeffrey A.W.,* 2010 WI App 29, 323 Wis. 2d 541, 780 N.W.2d 231; *State v. Berard,* No. 2010AP2439–CR, unpublished slip op. (Ct. App. Jan. 25, 2012); *State v. Howland,* No. 2011AP532–CR, unpublished slip op. (Ct. App. Dec. 14, 2011). There is no evidence that the court of appeals utilizes its power of discretionary reversal except in limited and extreme circumstances.

Not one example cited above mentions the word "exceptional," much less analyzes what exceptional circumstances led the court of appeals to grant a new trial. It appears that under the majority's analysis, nearly every instance where the court of appeals has ordered a new trial in the interest of justice in recent years was an erroneous exercise of discretion. *See also State v. Plude,* 2008 WI 58, ¶¶ 52–102, 310 Wis. 2d 28, 750 N.W.2d 42 (Ziegler, J., concurring) (concluding that granting a new trial in the interest of justice was required without analyzing whether the case was exceptional).

## III

¶ 111. A straightforward application of the correct standard of review reveals no error of fact or law that requires reversal. As I note above, the court of appeals' grant of a new trial in the interest of justice is properly reviewed solely for an erroneous exercise of discretion. No one argues that the court of appeals committed an error of fact, so the sole question on review should be whether the court of appeals' exercise of discretion was based on an error of law.

¶ 112. This court has concluded that the real controversy was not fully tried in two situations. *Hicks,* 202 Wis. 2d at 160. First, when the jury was erroneously denied the opportunity to hear important evidence bearing on an important issue in the case. *Id.* Second, when the jury had before it evidence not properly admitted that "so clouded" a crucial issue that it may be fairly said that the real controversy was not fully tried. *Id.*

¶ 113. Here, the first situation is arguably satisfied. The photogrammetry evidence was not heard by the jury but bears on a critical issue in the case. Identification is nearly always an important issue in a criminal case, but in this case it was Avery's principal defense. He testified that he was not a participant to the robberies and that his confession was coerced. Avery produced several alibi witnesses who corroborated his version of the events.

¶ 114. In contrast, the State's case was heavily dependent on two eyewitnesses to the robberies. This court has been critical of the reliability of eyewitness identification testimony, observing that studies confirm that eyewitness testimony is often "hopelessly unreli-

able."[4] *State v. Dubose,* 2005 WI 126, ¶ 30, 285 Wis. 2d 143, 699 N.W.2d 582. In *Dubose,* we cited to a United States Department of Justice study reporting that 85% of wrongful convictions in the study were based primarily on misidentification. *Id.* This court stated:

> The research strongly supports the conclusion that eyewitness misidentification is now the single greatest source of wrongful convictions in the United States, and responsible for more wrongful convictions than all other causes combined. In a study conducted by the United States Department of Justice of 28 wrongful convictions, it determined that 24 (85 percent) of the erroneous convictions were based primarily on the misidentification of the defendant by a witness.

*Id.* (Citations omitted.)

¶ 115. Studies also reveal an alarming number of false confessions. Since 1992 the Innocence Project has used DNA evidence to help exonerate 301 people who

---

[4] In light of the voluminous body of scientific knowledge that questions the reliability of eyewitness identifications, the Oregon Supreme Court recently established new procedures for the admissibility of eyewitness identifications. These procedures include shifting the burden of proof to the State to show that eyewitness identifications are sufficiently reliable to be admissible as evidence. *State v. Lawson,* 291 P.3d 673, 2012 WL 5955056 (Or. 2012). The Oregon Supreme Court decision followed on the heels of a decision by the New Jersey Supreme Court which also recognized the need to establish new procedures for the admissibility of eyewitness identifications. *State v. Henderson,* 27 A.3d 872 (N.J. 2011). *See also* Honorable Stuart Rabner, *Evaluating Eyewitness Identification Evidence in the 21st Century,* 87 N.Y.U. L. Rev. 1249 (2012); Office of the Wisconsin Attorney General, *Model Policy and Procedure for Eyewitness Identification,* http://www.doj.state.wi.us/dles/tns/eyewitnesspublic.pdf (last visited Dec. 19, 2012).

were wrongly convicted of a crime.[5] About 25 percent were found to have given a false confession or plead guilty to the crime for which they were subsequently exonerated.[6] Given the "hopelessly unreliable" nature of eyewitness identification testimony and the alarming incidence of false confessions, photogrammetry evidence that tends to show Avery was not a robber at Malone's Fine Foods certainly could reasonably be considered evidence not heard by the jury that bears on an important issue in the case.[7] *Hicks*, 202 Wis. 2d at 160.

¶ 116. It is not an error of law to conclude if the jury believed the photogrammetry evidence, Avery could not have been present for the Malone's Fine Foods robbery. His alibis for both robberies are likely to be viewed much more favorably by a jury if he could show, as the photogrammetry evidence arguably does, that he was not involved in at least one of the two robberies.[8]

---

[5] Innocence Project, http://www.innocenceproject.org/index.php (last visited Nov. 20, 2012).

[6] Innocence Project, *False Confessions,* http://www.innocenceproject.org/understand/False-Confessions.php (last visited Nov. 20, 2012).

Several academic studies find that false confessions are surprisingly easy to induce from innocent confessors. *See, e.g.,* Jennifer T. Perillo & Saul M. Kassin, *Inside Interrogation: The Lie, The Bluff, and False Confessions,* 35 Law & Hum. Behav. 327 (2011); *False Confessions: Silence is Golden,* The Economist, Aug. 12, 2011.

[7] The court had the benefit of a non-party brief filed by distinguished academics and forensic scientists. The brief criticizes the methodology used by the prosecutor's expert for the "radically non-blind" nature of his evaluation. It concludes that "[a]ny rational factfinder should give it little weight, and it certainly should not be treated as dispositive in this case."

[8] The majority opinion repeatedly refers to and applies the "reasonable probability test." Its holding in footnote 16 leaves for another day the standard for the reasonable probability test.

¶ 117. Because it committed no legal or factual error, I conclude that the court of appeals' decision was not an erroneous exercise of discretion. Rather, the error here lies in the majority's substitution of its own evaluation of this case in place of the court of appeals' reasoned determination that this case warrants a new trial in the interest of justice. Accordingly, I respectfully dissent.

¶ 118. I am authorized to state that CHIEF JUS-TICE SHIRLEY S. ABRAHAMSON joins this dissent.

---

I am concerned about the effect of this holding on existing case law that has adopted a standard.