DUGAN, J.
¶1 Jerry Simone Wilson appeals the order denying his motion for postconviction relief based on newly discovered evidence. Wilson was convicted of first-degree reckless homicide with use of a dangerous weapon and two counts of recklessly endangering safety with use of a dangerous weapon, following a jury trial.
¶2 Wilson argues that the postconviction court erroneously exercised its discretion when it denied his motion for a new trial based upon newly discovered evidence that could be provided by a witness who did not testify at trial. We conclude that the postconviction court properly determined that Wilson did not meet his burden of proving that he was not negligent in seeking that evidence. Therefore, we affirm.
BACKGROUND
The incident
¶3 During the early morning hours of May 23, 2009, three men, Melvin Williams, R.D., and R.T., were shot in the 2300 block of North 44th Street in Milwaukee. Williams was shot in the chest and died as a result.
¶4 The shootings occurred in front of a duplex on the west side of North 44th Street, where after-hours parties were taking place in the upper and lower units. A large number of people were outside. Some people were fighting outside the duplex. A man, later identified as Wilson, came out of an open space between two residences on the same side of the street as the duplex and began shooting into the crowd.
¶5 Police were dispatched to the scene at about 3:26 a.m. and observed a large group of people. R.T. told the police that he had been shot and that his uncle, Williams, also had been shot. Prior to police arriving, Williams was transported to a hospital by R.D. and others in a Dodge Durango. R.D. was treated at the hospital for bullet graze wounds.
¶6 Antwan Smith-Currin told a detective that he saw the shooter emerge from an open area between two residences on the west side of the street, two houses north of the duplex. He also said that he knew who did the shooting and identified the shooter as "Simone."[1] The police showed Smith-Currin a photo array. He identified Wilson as the shooter and said that he was 100% sure that the person he identified was the shooter. Smith-Currin said that Wilson shot one victim, later identified as Williams, three times, and that Williams fell down, did not get up, and was eventually put into a dark-colored sports utility vehicle. He also told the police that he thought the shooter shot another victim in the foot.
The charges
¶7 The State charged Wilson with first-degree reckless homicide with use of a dangerous weapon, and two counts of recklessly endangering safety with use of a dangerous weapon.
The trial and sentencing
¶8 The trial court presided over a six-day trial in August 2010. The State's theory of the case was that there was a single shooter, Wilson. Wilson's defense was that the witnesses misidentified him as the shooter. Trial witnesses included Smith-Currin, R.T., R.D., and several bystanders.
¶9 The shooting was preceded by a large fight. R.T. testified that on May 23, 2009, he had been at a tavern with his sister, Tiffany Taylor; his cousins, Williams and Shatina Williams; and two other men, R.D. and his brother. When the tavern closed, all the men drove to the 2400 block of 44th Street, where R.T. lived. Taylor followed, driving a van with some other women who had been at the tavern.
¶10 When they arrived at the 2300 block of 44th Street, there was an after-hours party going on. There were many people outside, and R.T. heard someone on the street call Taylor "a bitch." R.T. and the other men saw that Taylor had parked and that she went over to find out who had called her "a bitch." Taylor and the women from her van started arguing with people outside the duplex. R.T. and Williams went over to them and tried to break up the argument, but a man in the crowd "started talking crazy" and tried to punch R.T. Then, R.T. and R.D. started fighting with some men in the crowd while Williams was trying to end the fight. While R.T. was standing next to Williams, he heard gunshots and "[e]verybody started running." R.T. stated he heard three or four gunshots and saw the fire from the gun, which was about thirteen feet away from him.
¶11 R.D. testified that he was with Williams when Williams grabbed Taylor to try to get her to go home. Then R.D. heard about six gunshots and the next thing he knew, Williams was on the ground. R.D.'s brother then pulled up in the Durango; and R.D., his brother, and Taylor placed Williams in the vehicle. They then drove Williams to the hospital. At the hospital, R.D. noticed that he had been shot.
¶12 Smith-Currin, who lived in the upper unit of the duplex, knew Wilson prior to the shooting, identified Wilson as the shooter in a photo array and in the courtroom, and described the shooting in detail. He was on the lower porch of the duplex and saw women fighting in front of the duplex. Williams tried to break up the fight, but another man would not let him. The men then began fighting. Smith-Currin saw Wilson come from an open space between two houses that were on the same side of the street as the duplex, go into the street, and start shooting at Williams and R.T. Smith-Currin saw Wilson move toward R.T. and shoot at him two times from about seven to eight feet away. Then he saw Williams come from behind a car. Smith-Currin saw Wilson shoot at Williams three times from about nine feet away, and Williams fell toward the front of the car into the street. He saw Wilson fire two more shots and then run back through the open space. Smith-Currin saw a truck pull up, saw people put Williams inside, and saw them drive away. He did not see or hear anyone else shooting at the time, and all the shots sounded the same.
¶13 Shakira King, a bystander, testified that she had seen Wilson twenty or more times before May 23, 2009. During the incident, she saw him come out of the open space between two houses on the same side of the street as the duplex. She was two feet away from Wilson when he started shooting toward the people who were fighting. King stated that she identified Wilson as the shooter in a photo array that police showed her the day after the shooting. She also identified Wilson in the courtroom as the shooter. There was "no doubt in her mind" that Wilson was the shooter.
¶14 Samantha Coats and Sanntanna Ross, who were called as witnesses by the State, testified that Wilson was not the shooter. However, Detectives Matthew Goldberg and Charles Mueller testified that when Coats and Ross had been interviewed by the police, each had previously identified Wilson as the shooter.
¶15 The jury returned guilty verdicts on all three charges. The trial court imposed a global sentence of twenty-eight years of initial confinement and twelve years of extended supervision.
Wilson's postconviction motion based on new evidence
¶16 On November 11, 2013, Wilson filed a pro se WIS. STAT. § 974.06 (2013-14)[2] motion, asserting as germane to this appeal, that he had newly discovered evidence in the form of a statement from Lakisha Wallace that showed Smith-Currin was the shooter.[3] The postconviction court denied the motion without a hearing. Wilson appealed.
First appeal and petition for review
¶17 This court affirmed the postconviction court. We concluded that most of Wallace's proof that Smith-Currin was the shooter was based on statements that Smith-Currin purportedly made to others, which were hearsay and, therefore, generally not admissible at trial. We also noted Wallace's statements that she saw Smith-Currin drinking and using drugs during the party, thereby undermining his credibility, and that Smith-Currin had a motive to identify Wilson as the shooter. We stated that such evidence was merely impeachment evidence that required corroboration. On August 23, 2016, this court denied Wilson's request for reconsideration.
¶18 Wilson filed a petition for review.[4] On February 17, 2017, our supreme court granted Wilson's petition for review, summarily reversed the relevant portion of this court's decision regarding Wilson's newly discovered evidence claim, and remanded the matter to the postconviction court for an evidentiary hearing. The order noted that the matter was remanded to the postconviction court "for further proceedings in light of the State's concession that [Wilson] is entitled to an evidentiary hearing on his newly discovered evidence claim."
Post-remand evidentiary hearing
¶19 The postconviction court held an evidentiary hearing on August 11, 2017. Wallace and Wilson testified at the hearing.
Wallace's testimony
¶20 Wallace testified that she lived in the lower unit of the duplex, she knew and is related to Barbara Smith, who resides in the upper unit, and knew Smith's sons, Smith-Currin and James Currin. On the night of the shooting, Wallace was having a small party downstairs and Smith was having a big party upstairs. Wallace, whose unit had a front porch with large windows overlooking it, saw Smith-Currin on the front porch smoking marijuana, drinking, and taking Ecstasy. She testified that she heard a commotion outside and then she had "seen" Smith-Currin asking his brother for a gun. Smith-Currin then came to her back door, and she shut the door and went to the front of her home. She then saw a "whole bunch of fights breaking out, people screaming," and heard Smith-Currin yelling and using expletives indicating that people should move away from his mother's house. Then Smith-Currin "ran down like a couple stairs and he was shooting. He started shooting a gun." She also testified that Smith-Currin "ran down like probably like two stairs and started shootin' into the crowd, and then he ran back on the porch" and tried to enter her home, and she told him "no."
¶21 Wallace locked her door, told her guests to leave, and she left through the back door. As she was leaving, she heard Smith-Currin state, "Yeah I popped that [person]" and she heard James Currin state, "Shut the [expletive] up. I told you to stop taking these pills ... Look what you got yourself into." Wallace heard more than one person shooting that night. She testified that Smith-Currin was wearing black tight jeans and his hair was braided at the back.[5] Additionally, Wallace stated that Smith-Currin might dislike Wilson because Smith-Currin was currently dating Wallace's cousin, Tamika Wallace, and that Wilson had beaten up Wallace's cousin in the past. Wallace also testified that she overheard Smith-Currin tell Tamika Wallace, "Ima put this all on [Wilson.]" Tamika Wallace also repeated the statement to Wallace.
¶22 Wallace testified that she was present at the time of the shootings, but the police never talked to her. She did not go to the police because they had not questioned her, she was scared, and she did not want to deal with the police.
¶23 Wallace further testified that in 2011 or 2012, Wilson's mother called Wallace, stating she heard that Wallace had information about the shooting. Wallace told her that she did. Then, on July 1, 2013, Wallace told Wilson's mother about the shooting and Wilson's mother typed a statement to reflect what Wallace told her and they had it notarized. Because Wallace cannot read or write, Wilson's mother read the typed statement to her. Wallace's friend, Bobby Simmons, also read the statement to her. Wallace had the statement notarized and said that she relied upon what they read to her as reflecting the statement's content when she swore that her statement was true.
Wilson's testimony
¶24 Wilson testified that he knew Wallace through the 44th Street community and that he set up the sound system for Wallace's party on the night of the shootings. He testified that sometime between March and May 2011, Wallace reached out to him by letter, stating that she had information about what happened the night of the shooting. Wilson said that he had his mother follow up with Wallace. He also said that after Wallace had written him, he sent Wallace a letter asking her if she would testify and what information she had. Wallace wrote back "yes," and gave Wilson her contact information. Wilson testified that he did not save the first or second letter from Wallace and did not make a copy of the letter he sent to her.
The postconviction court's post-remand decision
¶25 The postconviction court found that Wallace's testimony was generally credible. It determined that Wilson's testimony was wholly incredible because it was "designed to achieve a particular end rather than designed to just relay what it is that happened." The postconviction court found it totally incredible that Wallace, an illiterate person, would spontaneously begin a written correspondence with Wilson. It also found that the contact information that Wilson testified Wallace had provided in the second letter would have been unnecessary if Wallace had written him earlier and Wilson had been able to write back to Wallace. The postconviction court found that none of the letters were consistent with Wallace's testimony and that the existence of any correspondence between Wallace and Wilson was inconsistent with Wallace's testimony.
¶26 The postconviction court further concluded that Wilson had not proved that he could not have discovered Wallace's testimony until after trial. It noted that Wilson knew that Wallace was a potential witness because he had been at her home mere hours before the shooting to help her set up the music for the party, and that when Wilson was charged, he would have learned the location of the shooting. The postconviction court also concluded that for the same reasons, Wilson was negligent in not obtaining Wallace's testimony. Based on those findings, the postconviction court denied the motion and did not address whether Wilson showed a reasonable probability that the result of his trial would have been different if Wallace testified.
¶27 This appeal followed.
DISCUSSION
¶28 Wilson argues the postconviction court erroneously exercised its discretion in denying his motion for a new trial because contrary to its determination, he met his burden of proof with respect to the first four prongs of the newly discovered evidence test. He also contends that because Wallace's evidence undermines the State's theory of the case, the evidence creates a reasonable probability of a different outcome. In response, the State argues that the postconviction court correctly determined that Wilson was negligent in seeking Wallace's testimony and that Wallace's testimony does not create a reasonable probability of a different result. The State's response states that "the State does not assert that Wilson did not discover Wallace's testimony until after trial, that it was not material, or that it was cumulative."
I. Standard of review
¶29 The decision to grant a motion for a new trial based on newly discovered evidence is committed to the postconviction court's discretion. State v. Avery , 2013 WI 13, ¶22, 345 Wis. 2d 407, 826 N.W.2d 60. We review the postconviction court's determination for an erroneous exercise of discretion. See id.
¶30 To be entitled to a new trial based on newly discovered evidence
a defendant must prove: "(1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking the evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." If the defendant is able to prove all four of these criteria, then it must be determined whether a reasonable probability exists that had the jury heard the newly-discovered evidence, it would have had a reasonable doubt as to the defendant's guilt.
State v. Plude , 2008 WI 58, ¶32, 310 Wis. 2d 28, 750 N.W.2d 42 (citations omitted). A defendant has the burden of proving prongs one through four by clear and convincing evidence. See State v. Armstrong , 2005 WI 119, ¶161, 283 Wis. 2d 639, 700 N.W.2d 98.
¶31 On appeal, we do not disturb the postconviction court's credibility determinations. See State v. Turner , 114 Wis. 2d 544, 550, 339 N.W.2d 134 (Ct. App. 1983) (stating that, "[w]hen required to make a finding of fact, the [postconviction] court determines the credibility of the witnesses and the weight to be given to their testimony and its determination will not be disturbed by this court on appeal where more than one inference may be drawn from the evidence."). See also WIS. STAT. § 805.17(2) (stating that, "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the [postconviction] court to judge the credibility of the witnesses") (made applicable to criminal proceedings by WIS. STAT. § 972.11(1) ).
II. The postconviction court properly concluded that Wilson was negligent in seeking the evidence from Wallace
¶32 Wilson argues that the postconviction court's determination that Wilson was negligent placed an unreasonable burden on him. He points to the facts that Wallace was never interviewed by the police and that she did not provide her information to the police. He also argues that the postconviction court erred in relying on State v. Boyce , 75 Wis. 2d 452, 249 N.W.2d 758 (1977), and Sheehan v. State , 65 Wis. 2d 757, 223 N.W.2d 600 (1974), because both of those cases involved persons who were identified as witnesses prior to trial.
¶33 Wilson's arguments are not persuasive. The issue is not whether the State could have found Wallace or whether Wallace could have contacted the police and provided the information. The issue was whether Wilson was negligent in seeking the evidence. See Armstrong , 283 Wis. 2d 639, ¶161. The record supports the postconviction court's finding that prior to trial, Wilson knew about Wallace and the fact that she might have relevant evidence. At the evidentiary hearing, Wilson also stated that he asked trial counsel to go to the neighborhood and investigate individuals of that neighborhood. However, he admitted that he never provided Wallace's name to his attorney even though he knew that "this" had happened in front of Wallace's residence and he knew that she had been there because he set up the sound system for the party. A court cannot grant a new trial based on new evidence when the defendant knew about the evidence before trial but did not tell his lawyer. See State v. Albright , 98 Wis. 2d 663, 674, 298 N.W.2d 196 (1980).
¶34 Furthermore, the postconviction court concluded that Wilson was negligent in seeking to discover Wallace's testimony and that determination is supported by the evidence. Wilson had sufficient information before his trial that Wallace was a potential witness to the shooting. Wilson and Wallace knew each other from the neighborhood before the shooting and Wilson also knew that Wallace had a party at her home the night of the shooting because he helped her set up the music for the party. As a result, he knew her address and, after the State charged him with the crimes, Wilson knew that the party at Wallace's home was relevant to the allegations against him. The complaint specifically references the party and provides the address of the duplex where it occurred. Wilson should have known that Wallace was a potential witness to the shootings and could have sought to learn what she knew.
¶35 Wilson contends that no one contemplated that Wallace would be a witness at the trial and that she deliberately withheld information about the shooting. He also states that the postconviction court made no findings about Wallace's availability before trial and that although Wilson was at Wallace's home earlier in the day and helped her set up music for her party, that does not necessarily mean that she would have still been in the area when the shooting occurred, that she would have been in a position to see it, or that she was even awake and aware of what was going on. He argues that at best, Wilson knew Wallace may have been one of at least 100 people who may have been in the general vicinity of an otherwise random street shooting, and that the postconviction court imposed an onerous pretrial discovery burden on him.
¶36 We are not persuaded by Wilson's arguments. Wallace was not merely one of at least 100 people who may have been in the general vicinity of the shooting. She lived in one of two units in a duplex, both of which were having an after-hours party that was ongoing in the street outside the duplex. Wilson knew there was going to be a party. He set up the music for it and, therefore, knew the address. When Wilson read the complaint specifying the address of Wallace's home, he clearly should have known and, in fact, did know that Wallace was having a party at the location, and that the shooting occurred during the party. Moreover, Wallace did not withhold her information. As she testified, she did not give a statement to anyone because no one interviewed her. There is nothing in the record to suggest that she would not have testified if someone had interviewed her before trial. In fact, her postconviction willingness to cooperate with Wilson's family, sign a statement, and testify at the hearing indicates that she would have testified.
¶37 Wilson further argues that Wallace's testimony could not have been reasonably foreseen, that the State's zealous investigation failed to uncover her, and that a reasonable person might expect that someone like Wallace would come forward. However, Wallace testified that after the shooting, she left the residence and she was not present during the police investigation. She also testified that the police were "arresting everybody" around her, but "they didn't arrest [her] or they didn't come knock on [her] door," or ask her any questions. By contrast, Wilson knew that Wallace lived in one of the duplex units where the shooting occurred, and offers no evidence that she was not available to be contacted immediately upon his discovery of the factual basis for the charges. Nor does he offer any evidence suggesting that Wallace was not available to testify. Wallace testified that at the time of the trial no lawyer contacted her, she was "waitin' on a lawyer ... to contact [her]. They didn't never contact [her.]"
¶38 Wilson had the burden to prove by clear and convincing evidence that he was not negligent in seeking to obtain this evidence. Wallace was a specific, identifiable person, with an obvious connection to the events, Wilson knew her personally, and he could reasonably assume she might know something about the shooting. Wilson admitted that he asked trial counsel to go to the neighborhood and investigate individuals of that neighborhood but that he never provided Wallace's name to his trial counsel.
¶39 Wilson has not established that the postconviction court erred as a matter of law in determining that he failed to establish by clear and convincing evidence that he was not negligent in obtaining the evidence from Wallace. The postconviction court's decision has a reasonable basis and its findings of fact are supported by the evidence and, therefore, are not clearly erroneous. Therefore, we must uphold its determination on appeal.
III. We need not address the remaining prong of the newly discovered evidence test
¶40 Because Wilson did not establish the first four prongs of the newly discovered evidence test, we do not address the final prong. See Avery , 345 Wis. 2d 407, ¶25.
CONCLUSION
¶41 For the foregoing reasons, we affirm the postconviction court's denial of Wilson's motion for a new trial.
By the Court. -Order affirmed.
Not recommended for publication in the official reports.

Smith-Currin knew Wilson as "Simone." Other witnesses also knew Wilson as Simone and another referred to him as "Mone."

All other references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

Previously, Wilson filed a postconviction motion, which was denied without a hearing. He then appealed the judgment and the denial of that motion. On appeal, Wilson contended that trial counsel was ineffective because he did not track down alibi witness, "Patricia," who Wilson claimed he was with when the shootings occurred; did not investigate the possibility that Wilson was misidentified; and did not elicit evidence to show the jury Smith-Currin's bias and ill will toward Wilson. On May 15, 2012, this court affirmed holding that the allegations of Wilson's motion were insufficient to warrant a hearing.

Wilson's petition for review is not included in the record.

This description differs from King's description of what the shooter was wearing.