COURT OF APPEALS
DECISION
DATED AND FILED

January 30, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2022AP936-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2019CF83

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

ORLANDO PIERRE EATON,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Pierce County: ELIZABETH L. ROHL, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Orlando Eaton appeals a judgment convicting him of first-degree reckless homicide by delivery of a controlled substance as a party

to the crime. Eaton also appeals an order denying his motion for postconviction relief. Eaton argues that the circuit court erred by denying his postconviction motion without holding an evidentiary hearing because his motion alleged sufficient facts that entitled him to a hearing on his claims for ineffective assistance of counsel, newly discovered evidence, and sufficiency of the evidence. We reject Eaton's argument and affirm.

## BACKGROUND

¶2      According to the amended criminal complaint, on May 10, 2017, law enforcement responded to a reported overdose death at a residence in River Falls, Wisconsin. Upon arrival, law enforcement discovered the body of Pearson in a basement bedroom.[1] Upon a search of Pearson's body, River Falls Police Investigator Ryan Miller discovered a gem pack near Pearson's head.[2] The gem pack contained a grayish-white substance that was later confirmed to be heroin. An autopsy determined that a mixed drug toxicity of heroin and amphetamine caused Pearson's death.

¶3      During his investigation, Miller discovered that Pearson was with Dante Ackerman on the night of May 9, 2017. While gathering information on Ackerman, including his cell phone number, Miller received information about two heroin dealers in St. Paul, Minnesota: Eaton, known as "Pete," and another

---

[1] Although not required by WIS. STAT. RULE 809.86 (2021-22), we refer to the homicide victim in this case using a pseudonym to protect his family's privacy. We also refer to his family members later in the opinion using pseudonyms. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

[2] At trial, one of the State's witnesses explained that a gem pack is a small "clear ziplock plastic baggie."

2

individual known as "E." Miller also received information that Ackerman had contacted Eaton seventy-two times between April 28, 2017, and May 21, 2017, including once on May 9. Miller then obtained cell phone records for Pearson, Ackerman and Eaton. He also obtained GPS information for Ackerman's cell phone. The cell phone records showed that Pearson contacted Eaton on May 9 and that Pearson was in an area near Eaton's address. The phone records also revealed that Pearson, Ackerman and Eaton were in the same area at the same time on May 9.

¶4    Miller interviewed both Ackerman and Eaton. Eaton told Miller that he had met with Ackerman and Pearson between five and ten times, that Ackerman and Pearson always came together, and that he gave Ackerman and Pearson heroin whenever they came to see him. Eaton also told Miller that he "got rid of" the cell phone for which Miller had records when Ackerman started talking to law enforcement about Eaton.

¶5    The State charged Eaton with one count of first-degree reckless homicide by delivery of a controlled substance as a party to the crime in relation to Pearson's death. At trial, the jury heard testimony from several witnesses, including Ackerman, Miller and Eaton.

¶6    Ackerman testified that on May 9, 2017, Eaton sent a group text that read, "I'm good the best." Ackerman explained that this was a message Eaton typically sent when heroin was available for sale. Ackerman testified that he picked up Pearson from his home in River Falls and drove to St. Paul. Ackerman then called Eaton to tell him that he was close to Eaton's location. When they arrived, Eaton gave the heroin to Pearson, who then paid for the heroin.

¶7     Ackerman also testified that he and Pearson went somewhere else before returning to River Falls, but he could not remember where. Miller and another witness, Colin Janilla, explained that Ackerman and Pearson stopped in Minneapolis. Janilla testified that he met with Pearson in an alley near Janilla's apartment in Minneapolis on May 9, 2017. Janilla admitted that he met with Pearson to conduct a drug transaction, but he denied selling heroin to Pearson.

¶8     Ackerman further testified that when he and Pearson returned to River Falls, they went to Pearson's room in the basement of Pearson's home and used the heroin Pearson had received from Eaton. Ackerman then left Pearson's house. The next morning, Pearson's sister informed Ackerman that Pearson had died. Ackerman then attempted to contact Eaton to tell him that Pearson had overdosed.

¶9     Ackerman further revealed throughout his testimony that he had received a plea deal from the State. In exchange for his truthful testimony, the State amended Ackerman's reckless homicide charge to a possession of heroin charge. Ackerman also admitted that he lied during his interviews with law enforcement. When Eaton testified, he agreed that he helped Ackerman and Pearson buy heroin at some point, but he did not specifically remember a transaction occurring on May 9, 2017.

¶10    Miller testified about his investigation into Pearson's death, including his use of a web-based mapping program called CellHawk. Miller used CellHawk to import the call detail records that he collected from various phone companies. Miller explained that CellHawk "automatically takes the information and plots points on the map" that correspond with cell phone towers in the area. The cell phone's location is deemed to be in the area of the tower. Miller used

CellHawk to create a video showing approximate cell phone locations for Pearson, Ackerman and Eaton on May 9, 2017, and GPS location data for Ackerman's phone throughout the day. The locations were consistent with Ackerman's testimony regarding his and Pearson's travels on May 9.

¶11 The jury found Eaton guilty of the crime charged. The circuit court subsequently imposed a ten-year sentence consisting of five years of initial confinement followed by five years of extended supervision. Eaton then filed a postconviction motion seeking a new trial on two grounds and dismissal on another ground. First, Eaton alleged that his trial counsel was ineffective because she failed to: (1) object when the State asked several witnesses whether they had ever been convicted of a crime and those witnesses responded, "[N]o"; (2) failed to subpoena Ackerman; (3) failed to impeach Ackerman with sufficient evidence; and (4) failed to call an expert to challenge Miller's testimony regarding his use of CellHawk. Eaton further alleged that his trial counsel's combined errors prejudiced him. Second, Eaton alleged that his proposed expert's testimony regarding CellHawk constituted newly discovered evidence. Finally, Eaton alleged that the State presented insufficient evidence to convict him because Wisconsin lacked territorial jurisdiction over the alleged crime, which required dismissal.

¶12 The circuit court denied Eaton's postconviction motion without holding an evidentiary hearing, concluding that the motion failed to allege sufficient facts that, if true, would entitle Eaton to the requested relief. The court found that Eaton's claims for ineffective assistance of counsel were insufficient, conclusory and speculative. The court similarly found that it could not assess Eaton's newly discovered evidence claim because he failed to allege any information explaining the newly discovered evidence. Finally, the court rejected

5

Eaton's territorial jurisdiction argument because it was undisputed that Pearson died in Wisconsin.

¶13    Eaton now appeals.  Additional facts will be provided as necessary below.

## DISCUSSION

¶14    Whether the circuit court erroneously exercised its discretion by denying a defendant's postconviction motion without holding an evidentiary hearing presents a mixed standard of review.  *State v. Ruffin*, 2022 WI 34, ¶26, 401 Wis. 2d 619, 974 N.W.2d 432.  First, we determine whether "the motion on its face alleges sufficient material facts that, if true, would entitle the defendant to relief."  *Id.*, ¶27.  We also determine whether the record conclusively demonstrates that the defendant is not entitled to relief.  *Id.*  Both determinations are questions of law that we review de novo.  *State v. Jackson*, 2023 WI 3, ¶8, 405 Wis. 2d 458, 983 N.W.2d 608.

¶15    If the defendant's postconviction motion does not raise sufficient facts entitling the defendant to relief, or presents only conclusory allegations, "or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing."  *Ruffin*, 401 Wis. 2d 619, ¶28.  We review a circuit court's discretionary decision for an erroneous exercise of discretion.  *Id.*  "An exercise of discretion is erroneous if it is based on an error of fact or law."  *Id.*

¶16    A postconviction motion alleges sufficient facts when it includes "facts that 'allow the reviewing court to meaningfully assess [the defendant's] claim.'"  *State v. Allen*, 2004 WI 106, ¶21, 274 Wis. 2d 568, 682 N.W.2d 433

(alteration in original; citation omitted). Those facts must be material to the defendant's claim and must include "the five 'w's' and one 'h'; that is, who, what, where, when, why, and how." *Id.*, ¶¶22-23.

¶17 Eaton argues that he was entitled to an evidentiary hearing because his motion provided "particularized reasons why a hearing should have been granted." We conclude, for the reasons explained below, that the circuit court did not erroneously exercise its discretion by denying Eaton's motion without a hearing.

## I.  Ineffective assistance of counsel

¶18 A claim for ineffective assistance of counsel requires the defendant to show both that his or her trial counsel's performance was deficient and that counsel's deficient performance resulted in prejudice to the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We need not address both parts if the "defendant makes an insufficient showing on one." *Id.* at 697.

¶19 Trial counsel's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. Judicial scrutiny of counsel's performance is highly deferential and strongly presumes "that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Courts must avoid "the distorting effects of hindsight" and evaluate the reasonableness of counsel's conduct "on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 689-90. The defendant must therefore "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690.

¶20 Prejudice requires the defendant to show "that but for his [or her] lawyer's error, there is a reasonable probability the jury would have had a reasonable doubt as to guilt." *State v. Sholar*, 2018 WI 53, ¶45, 381 Wis. 2d 560, 912 N.W.2d 89. A reasonable probability means "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Prejudice is not presumed "simply because certain decisions or actions of counsel were made in error." *State v. Balliette*, 2011 WI 79, ¶24, 336 Wis. 2d 358, 805 N.W.2d 334. Instead, the defendant "must establish that '*particular* errors of counsel were unreasonable' and 'that they *actually* had an adverse effect on the defense.'" *Sholar*, 381 Wis. 2d 560, ¶33 (citation omitted).

### A. Questions to witnesses regarding their prior convictions

¶21 Eaton's postconviction motion first argued that his trial counsel was constitutionally ineffective because she did not object to the State's questions to three witnesses who answered "[N]o" when asked whether they had any prior convictions. On the second day of trial, the State informed the circuit court and Eaton's counsel that it would be asking six witnesses if they had ever been convicted of a crime. These six witnesses were Walter and Janice—two of Pearson's family members—and Janilla, Ackerman, Virginia Kiesow, and Robin Anding. The State advised the court that Walter, Janice and Janilla would answer "[N]o" when asked about their prior convictions, while Ackerman, Kiesow and Anding would answer "[Y]es." Eaton's counsel did not object to the State asking the question of these witnesses.

¶22 Although Eaton's postconviction motion mentioned Janice's and Walter's responses to the State's question regarding any prior convictions, it did not allege anything more regarding their responses. Eaton's motion focused only

on Janilla's response, apparently because Janilla sold drugs to Pearson in Minneapolis on May 9, 2017, but denied selling heroin to Pearson. Eaton alleged that allowing Janilla to answer that he had no prior convictions unfavorably bolstered Janilla's credibility and "likely contributed to the jury verdict that it was Eaton, and not Colin Janilla, or someone else, that delivered the fatal dose." These are the only allegations that Eaton made in his motion regarding his counsel's failure to object to the State's questions to certain witnesses asking whether they had any prior convictions.

¶23 Eaton's speculative and conclusory allegations are insufficient to establish that he was prejudiced by his counsel's failure to object, especially given that he alleged no other facts demonstrating that Janilla's response had any effect on the jury. Eaton simply asserted that Janilla's lack of prior convictions bolstered Janilla's credibility with the jury and then summarily concluded that Janilla's lack of prior convictions *likely* contributed to the jury's verdict. But Eaton focused solely on Janilla's testimony and failed to assess it within the context of the rest of the evidence presented to the jury. This failure is particularly troublesome given that the question regarding prior convictions was only a brief moment in Janilla's testimony regarding his background and given that the State did not emphasize the answer. Eaton's failure to assess the impact of the jury hearing that Janilla had no prior convictions within the context of the rest of the evidence is further problematic because Eaton's counsel did elicit testimony affecting Janilla's credibility when Janilla admitted that he conducted a drug transaction with Pearson on May 9, 2017.

¶24 Without pointing to any facts showing how Janilla's response affected the verdict, and without assessing the testimony in the context of the rest of the evidence, Eaton cannot demonstrate a reasonable probability that his

counsel's failure to object had an effect on his defense and thus resulted in prejudice. Eaton's postconviction motion therefore failed to allege sufficient facts demonstrating that he is entitled to relief on his ineffective assistance of counsel claim relating to the State's questions regarding prior convictions.

*B. Ackerman's testimony*

¶25 At the end of Ackerman's testimony, Eaton's counsel noted that she might recall Ackerman. Ackerman, however, was allowed to leave as he had appeared voluntarily to testify and was not under subpoena from the State. Eaton's postconviction motion argued that his trial counsel was ineffective because she forgot to subpoena Ackerman and was unable to recall him for the defense's case. Eaton's motion further alleged that whatever counsel planned to do in order to attack Ackerman's credibility is unknown because she did not subpoena him and failed to recognize that the State did not subpoena him. The motion also alleged that Eaton's counsel presumably meant to impeach Ackerman with prior inconsistent statements he made during his interviews with law enforcement.

¶26 Eaton, however, never explains—either in his postconviction motion or now on appeal—why his counsel performed deficiently by failing to subpoena Ackerman in order to impeach him with his prior inconsistent statements, especially when counsel thoroughly cross-examined Ackerman and did impeach him regarding his prior inconsistent statements. Thus, Eaton's postconviction motion failed to allege sufficient facts demonstrating that he is entitled to relief on his ineffective assistance of counsel claim relating to counsel's failure to subpoena Ackerman.

¶27    Eaton's postconviction motion also argued that his trial counsel did not effectively impeach Ackerman. On cross-examination, Eaton's counsel used the transcripts from Ackerman's three interviews with law enforcement and thoroughly questioned him on statements he made during those interviews. Ackerman read from the transcripts of those interviews and admitted that he made several statements to law enforcement that were inconsistent with his trial testimony. For example, counsel questioned Ackerman about the name of a drug dealer in Minneapolis, "JR," that he provided in his second interview with law enforcement. Ackerman testified that JR was not a drug dealer, but then admitted JR was a "middleman" after counsel noted a different interview in which Ackerman stated that JR was a middleman.

¶28    Eaton's counsel also questioned Ackerman about another dealer referred to as "E" from whom he purchased drugs. Ackerman admitted that he purchased drugs from E and that E also lived in the St. Paul area. Counsel also asked Ackerman if he remembered telling law enforcement "that the main guy you would go to could be E?" Ackerman responded that he did not remember. Finally, Eaton's counsel asked:

> And if you go to page 29, you were asked during the interview, "Yes. At a later date, you find out that he died, that [Pearson] died after using heroin that you guys got from E, right? Did he use more than you?" And you said, "Yeah, because he just kept snorting it." Is that accurate?

Ackerman responded, "That is my belief that is why he died, because he continued to snort heroin, yes."

¶29    Eaton's postconviction motion alleged that his counsel attempted to make Ackerman admit that, in one of his interviews with law enforcement, he stated that "E" was the main source of drugs for both him and Pearson. Eaton

11

alleged that his counsel was nevertheless ineffective because she did not produce this statement or the video recording of that interview. He further alleged that counsel should have produced the video recording of an interview in which Ackerman stated he was "pretty sure" that he and Pearson purchased heroin from someone other than Eaton on May 9, 2017. Finally, Eaton alleged that counsel should have produced the statement or video recording in which Ackerman identified E as the seller of the drugs that killed Pearson, because the identification took place closer to the date of Pearson's death than to the date of the trial. Because the jury deliberated for a long time (from 10:47 a.m. to 4:47 p.m.), Eaton alleged that this evidence could have changed the verdict.

¶30 Given the facts alleged by Eaton and the undisputed record, Eaton has not met his burden to show that his counsel performed deficiently. In particular, Eaton does not explain how counsel's actual cross-examination of Ackerman was deficient. He only asserts that counsel should have used more statements and used the video recordings, but he fails to explain—either in his postconviction motion or now on appeal—why showing the jury the video recordings or introducing additional statements from the transcripts was necessary or would have made counsel's cross-examination any more effective. Although counsel could have used the video recordings during Ackerman's cross-examination, it does not mean that counsel was deficient for using the transcripts of those recordings instead of using the recordings themselves. We do not evaluate counsel's conduct based on hindsight. *See **Strickland***, 466 U.S. at 689. Furthermore, Eaton's counsel used the transcripts of Ackerman's interviews to ask questions about "E" similar to those that Eaton now alleges she should have asked. Counsel also used the transcripts to make Ackerman admit that he made inconsistent statements.

12

¶31 Eaton's conclusory assertions that counsel performed deficiently by failing to introduce the video recordings and additional statements, and that the missing evidence could have changed the verdict are insufficient to establish that trial counsel's cross-examination was deficient. Eaton therefore failed to allege sufficient facts demonstrating that he is entitled to relief on his ineffective assistance of counsel claim relating to counsel's alleged failure to effectively impeach Ackerman.

## C. CellHawk evidence

¶32 Eaton's postconviction motion next alleged that his trial counsel was ineffective because she failed to call an expert to challenge Miller's testimony regarding his use of CellHawk. Eaton alleged that such an expert would have "ascertain[ed] if [law enforcement] used the software correctly" and rebutted the State's claim that Pearson and Ackerman were near Eaton on the relevant date. Specifically, the motion alleged that Eaton's appellate counsel retained the services of an expert from Special Investigations and Forensic Technologies (SIFT) to evaluate the State's use of CellHawk. The motion further alleged that at a forthcoming postconviction evidentiary hearing, the SIFT expert would rebut the State's claims made at trial regarding Pearson's, Ackerman's and Eaton's location, "testify as to how [he] would have presented the information at trial if [he] were questioned and cross-examined," and "explain the failures of the State's assumptions using scientific principles … based on [his] expertise." Finally, Eaton's motion alleged that because the jury deliberated for a long time, it was "reasonable to assume the jury had some question" as to whether Eaton sold the heroin that caused Pearson's death.

13

¶33    We disagree in all respects.  Eaton's motion merely concluded that the State's use of CellHawk was flawed, that the SIFT expert would have rebutted the State's claims, and that the jury's lengthy deliberation was because it questioned whether Eaton sold the heroin to Pearson.  Eaton never explains—either in his postconviction motion or now on appeal—how Miller failed to make proper use of CellHawk, what the SIFT expert would have testified to at trial, or how that testimony would have rebutted the State's claims.  He further fails to explain how the use of an expert would have led to a different outcome.  Once again, Eaton was required to make sufficient allegations to support the conclusions in his postconviction motion; to the extent he relied on the sought-after evidentiary hearing to supply such information, that approach is not how the procedure works. *See Balliette*, 336 Wis. 2d 358, ¶68 ("The evidentiary hearing is not a fishing expedition to discover ineffective assistance; it is a forum to prove ineffective assistance.").  In any event, these allegations are, again, speculative and conclusory, and they are therefore insufficient to demonstrate that Eaton is entitled to relief on his ineffective assistance of counsel claim relating to Miller's testimony regarding his use of CellHawk.[3]

## II.  Newly discovered evidence

¶34    Eaton's postconviction motion also raised a claim of newly discovered evidence.  In a claim for newly discovered evidence, "the defendant

---

[3] Because Eaton's postconviction motion failed to allege sufficient facts demonstrating ineffective assistance of counsel in any respect, he is not entitled to relief on his aggregate prejudice claim.  *See State v. Thiel*, 2003 WI 111, ¶¶60-61, 264 Wis. 2d 571, 665 N.W.2d 305 (explaining that while a court "may aggregate the effects of multiple incidents of deficient performance" when determining prejudice, a defendant "may not simply present a laundry list of mistakes by counsel and expect to be awarded a new trial").

must prove, by clear and convincing evidence, that: (1) the evidence was discovered after conviction; (2) the defendant was not negligent in seeking evidence; (3) the evidence is material to an issue in the case; and (4) the evidence is not merely cumulative." *State v. McCallum*, 208 Wis. 2d 463, 473, 561 N.W.2d 707 (1997). If the defendant makes this showing, the court must then determine "whether a reasonable probability exists that a different result would be reached in a trial." *Id.* "A reasonable probability of a different result exists if there is a reasonable probability that a jury, looking at both the old and the new evidence, would have a reasonable doubt as to the defendant's guilt." *State v. Avery*, 2013 WI 13, ¶25, 345 Wis. 2d 407, 826 N.W.2d 60.

¶35 Eaton's postconviction motion alleged that the SIFT expert's testimony is newly discovered evidence that would have rebutted Miller's testimony regarding his use of CellHawk and made a difference at trial if it were made available to the jury. The motion also alleged that the information the SIFT expert provided was not known before trial. At the same time, however, and as discussed above, Eaton alleged that his trial counsel performed deficiently by failing to present this evidence to demonstrate Miller's errors in his use of CellHawk. Thus, the evidence *was* available at the time of trial, and Eaton cannot satisfy the newly discovered evidence test.

¶36 Furthermore, Eaton failed to allege any facts demonstrating the remaining elements of the newly discovered evidence test. Eaton only asserted, in a conclusory fashion, that the testimony would have rebutted Miller's testimony regarding his use of CellHawk and made a difference at trial. In short, Eaton fails to allege—either in his postconviction motion or now on appeal—any facts demonstrating that the SIFT expert's testimony was newly discovered evidence.

Therefore, he failed to allege sufficient facts demonstrating that he is entitled to relief on this claim.

### III. Sufficiency of the evidence regarding territorial jurisdiction

¶37 Finally, Eaton's postconviction motion alleged that the State cannot exercise territorial jurisdiction over his offense because he did not violate WIS. STAT. § 961.41 in Wisconsin, and WIS. STAT. § 940.02(2)(a), the crime for which he was charged and convicted, "explicitly requires delivery [of a controlled substance] 'in violation of' … § 961.41." Eaton asserted that he cannot face penalties for violating § 961.41 because "his actions were committed wholly out of state and no applicable territorial extensions have been declared by law." Eaton further asserted—and does so again in his appellate briefing—that § 940.02(2)(a) "does not include violations of other jurisdictions' laws that are similar to § 961.41." Because Eaton did not deliver heroin "in violation of" § 961.41 in Wisconsin, he argues that the State failed to present evidence demonstrating that Wisconsin had jurisdiction over Eaton for first-degree reckless homicide under § 940.02(2)(a).

¶38 Wisconsin's territorial jurisdiction statute provides that "[a] person is subject to prosecution and punishment" under Wisconsin law if that person "commits a crime, any of the constituent elements of which takes place in this state." WIS. STAT. § 939.03(1)(a). Constituent elements are the elements "that make up the underlying criminal offense." *State v. Anderson*, 2005 WI 54, ¶33, 280 Wis. 2d 104, 695 N.W.2d 731. In other words, they are "those elements of the criminal offense that the State is required to prove beyond a reasonable doubt in the prosecution of the offense." *Id.* Thus, Wisconsin has territorial jurisdiction

16

over a criminal offense if *any* of the elements making up the underlying criminal offense took place in Wisconsin. *See id.*; § 939.03(1)(a).

¶39 WISCONSIN STAT. § 940.02(2)(a) requires the State to prove that: (1) the defendant manufactured, distributed or delivered a controlled substance "in violation of [WIS. STAT. §] 961.41"; (2) "[t]he substance was by itself or contained [a controlled substance]"; (3) "[t]he defendant knew or believed that the substance was by itself or contained [a controlled substance]"; (4) the victim used the controlled substance; and (5) the victim died as a result of that use. Sec. 940.02(2)(a); WIS JI—CRIMINAL 1021 (2023).[4]

¶40 Here, Pearson died in River Falls, Wisconsin, as a result of using the heroin that Eaton delivered to him. Because death resulting from use of the controlled substance is a constituent element of WIS. STAT. § 940.02(2)(a), and because Pearson's death indisputably took place in Wisconsin, our state has territorial jurisdiction over Eaton. None of Eaton's arguments undermine this conclusion.[5] Accordingly, he is not entitled to relief on this claim.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

---

[4] Although the 2023 version of the jury instructions was not in effect at the time of Eaton's trial, for purposes of this appeal, it is materially the same as the version in effect at that time.

[5] While we need to decide the matter for purposes of rejecting Eaton's challenge regarding territorial jurisdiction, we perceive Eaton as reading too much into the clause "in violation of [WIS. STAT. §] 961.41" in WIS. STAT. § 940.02(2)(a). Moreover, Eaton was not separately charged with violating § 961.41 in this case.